FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2018 JAN 26  AM 10: 35

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

UNITED STATES OF AMERICA, STATE
OF CALIFORNIA, STATE OF GEORGIA,
COMMONWEALTH OF
MASSACHUSETTS, and STATE OF
FLORIDA *ex rel.* [FILED UNDER SEAL],

        Plaintiffs,

    vs.

[FILED UNDER SEAL],

        Defendants.

Civil Case No. 3:18-cv-166-J-39JBT

**COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES
FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

**DEMAND FOR JURY TRIAL**

**[FILED IN CAMERA AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)]**

S-1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF GEORGIA, COMMONWEALTH OF MASSACHUSETTS, and STATE OF FLORIDA** *ex rel.* **FBG, LLC**,<br><br>Plaintiffs,<br><br>**vs.**<br><br>**OPKO HEALTH, INC. LLC**, a corporation,<br>**PHILLIP FROST, M.D.**, an individual,<br>**MARC D. GRODMAN**, **M.D.,** an individual, and<br>**CHARLES TODD,** an individual.<br><br>Defendants. | Civil Case No. _____ |

## COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES
## FOR VIOLATIONS OF THE FALSE CLAIMS ACT

## DEMAND FOR JURY TRIAL

## [FILED IN CAMERA AND UNDER SEAL
## PURSUANT TO 31 U.S.C. § 3730(b)(2)]

## TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| I. | INTRODUCTION | 4 |
| II. | JURISDICTION AND VENUE | 5 |
| III. | PARTIES | 5 |
| IV. | BACKGROUND | 6 |
| V. | OVERVEW OF DEFENDANTS' PRACTICE OF PROVIDING FREE LAB TESTING TO DOCTORS AND CLINICS | 6 |
| VI. | OVERVEW OF DEFENDANTS' PRACTICE OF WAIVING PATIENT CO-PAYMENTS AND DEDUCTIBLES | 7 |
| VII. | OVERVEW OF DEFENDANTS' USE OF THE "LOSS-LEADER / PULL-THROUGH" KICKBACK SCHEME | 15 |
| VIII. | OVERVIEW OF DEFENDANTS' UNAUTHORIZED AND INAPPROPRIATE CODING SCHEMES | 16 |
| IX. | DEFENDANTS FAILED TO PASS ALONG THE LOWEST CHARGE TO MEDICAID PROGRAMS IN FAVOR OF PRIVATE PHYSICIANS | 18 |
| X. | DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY ROUTINELY WAIVING PATIENT CO-PAYMENTS AND DEDUCTIBLES, AND PROVIDING KICKBACKS | 23 |
| XI. | DEFENDANTS VIOLATED THE CALIFORNIA INSURANCE FRAUD PREVENTION ACT BY WAIVING PATIENT CO-PAYMENTS AND DEDUCTIBLES, AND PROVIDING KICKBACKS | 25 |
| XII. | DEFENDANTS VIOLATED THE FALSE CLAIMS ACTS BY BILLING FOR MEDICALLY UNNECESSARY LABORATORY TESTS | 25 |
| XIII. | CAUSES OF ACTION | 28 |
|  | FIRST CAUSE OF ACTION On Behalf of the United States Federal False Claims Act, Presenting False Claims 31 U.S.C. § 3729(a)(1)(A) | 28 |

SECOND CAUSE OF ACTION
On Behalf of the United States Federal False Claims Act,
Making or Using False Records or Statements Material to Payment or
Approval of False Claims 31 U.S.C. § 3729(a)(1)(B) ...................................................... 29

THIRD CAUSE OF ACTION
(In the Alternative) On Behalf of the United States,
Retention of Proceeds to Which Not Entitled 31 U.S.C. § 3729(a)(1)(G) ....................... 30

FOURTH CAUSE OF ACTION
On Behalf of the State of California, California Insurance Frauds
Prevention Act, Employment of Runner, Cappers and Steerers or
Other Persons to Procure Patients Cal. Ins. Code § 1871.7(a) ......................................... 31

FIFTH CAUSE OF ACTION
On Behalf of the State of California, California Insurance Frauds
Prevention Act, Presenting or Causing to be Presented False or
Fraudulent Claims for the Payment of An Injury Under A Contract
of Insurance Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(1)............................... 31

SIXTH CAUSE OF ACTION
On Behalf of the State of California, California Insurance Frauds
Prevention Act, Knowingly Preparing or Making Any Writing in
Support of a False or Fraudulent Claim Cal. Ins. Code § 1871.7(b);
Cal. Pen. Code § 550(a)(5) ............................................................................................... 32

SEVENTH CAUSE OF ACTION
On Behalf of the State of California, California Insurance Frauds
Prevention Act, Knowingly Making or Causing to be Made Any
False or Fraudulent Claim for Payment of a Health Benefit
Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(6)................................................... 33

EIGHTH CAUSE OF ACTION
On Behalf of the State of California, California Insurance Frauds
Prevention Act, Soliciting, Accepting, and Referring Business To or
From an Individual or Entity That Intends to Violate Section 550 of the
Penal Code or Section 1871.4 of the Insurance Code Cal. Ins.
Code § 1871.7(b); Cal. Pen. Code § 549 ......................................................................... 34

NINTH CAUSE OF ACTION
On Behalf of the State of Florida
Florida False Claims Act, Presenting False Claims

Florida Statute § 68.082(2)(a), Against All Defendants .................................................. 35

TENTH CAUSE OF ACTION
On Behalf of the State of Florida
Florida False Claims Act, Making or Using False Records or
Statements To Obtain Payment or Approval of False Claims
Florida Statute § 68.082(2)(b), Against All Defendants.................................................. 36

ELEVENTH CAUSE OF ACTION
On Behalf of the Commonwealth of Massachusetts
Massachusetts False Claims Act, Presenting False Claims Massachusetts
    General
Laws chapter 12, § 5B(1), Against All Defendants ......................................................... 36

TWELTH CAUSE OF ACTION
Massachusetts False Claims Act, Making or Using False Records or
Statements To Obtain Payment or Approval of False Claims
Massachusetts General Laws chapter 12, § 5B(2), Against All Defendants ................... 37

THIRTEENTH CAUSE OF ACTION
On Behalf of the Commonwealth of Massachusetts
Massachusetts False Claims Act, Retention of Proceeds Of Inadvertently
Submitted False Claims Massachusetts General Laws chapter 12, § 5B(9)
Against All Defendants.................................................................................................... 38

FOURTEENTH CAUSE OF ACTION
On Behalf of the State of Georgia
Georgia False Medicaid Claims Act, Presenting False Claims
OCGA § 49-4-168.1(a)(1), Against All Defendants......................................................... 39

FIFTEENTH CAUSE OF ACTION
On Behalf of the State of Georgia
Georgia False Medicaid Claims Act, Making or Using False Records or
    Statements
Against All Defendants.................................................................................................... 39

XIV.    PRAYER FOR RELIEF ............................................................................................... 40

XV.     DEMAND FOR JURY TRIAL ...................................................................................... 42

Plaintiffs UNITED STATES OF AMERICA ("United States"), STATE OF CALIFORNIA, STATE OF GEORGIA, COMMONWEALTH OF MASSACHUSETTS, and STATE OF FLORIDA and the STATE OF CALIFORNIA, by and through Relator FBG, LLC, allege as follows:

## I.    INTRODUCTION

1.    Over the past several years, OPKO HEALTH, INC. ("OPKO"), a publicly traded Florida company, and BIO-REFERENCE LABORATORIES, INC., ("BRLI"), a formerly publicly traded New Jersey company, which was acquired by OPKO in August 2015, and its owners and executives (collectively, "Defendants"), have perpetrated a fraud on U.S. taxpayers through various schemes designed to defraud Medicare and Medicaid.

2.    Defendants provide illegal kickbacks to doctors and clinics to induce those doctors and clinics to refer Medicare and Medicaid business to them.  Defendants promise doctors they will never have to pay invoices for tests billed to ordering physicians nor collect co-payments or patient deductible payments from the doctors' patients.  Other elements of the broader fraud include the use of unauthorized diagnostic codes to trigger payments, use of improper CPT up-coding to increase revenue, failure to pass on its lowest charges to state Medicaid programs, and marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients.

3.    This is a *qui tam* action for violation of the federal False Claims Act (31 U.S.C. §§ 3150 et seq.) to recover treble damages, civil penalties and attorneys' fees and costs for Plaintiffs and on behalf of the United States for fraudulent Medicare and

4

Medicaid billings. Non-public information personally known to Relator serves as the basis for this action. Relator brings claims under California Insurance Code §1871.7, *et seq.*, to recover fraudulent charges on behalf of the California Department of Insurance.

## II.   JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 31 U.S.C. sections 3730(b) and 3732(a), which confer jurisdiction on this Court for actions brought under the federal False Claims Act, and authorize nationwide service of process. Venue is proper in this district pursuant to 31 U.S.C. section 3732(a), as all Defendants transact business in the Middle District of Florida.

## III.   PARTIES

5.     The plaintiff in this action is the UNITED STATES OF AMERICA ("United States"), by and through Relator FBG, LLC.

6.     Relator FBG, LLC is a limited liability company.

7.     Defendant OPKO HEALTH, INC. is a Delaware corporation with its principal place of business in Florida.

8.     Defendant PHILLIP FROST, M.D. is CEO and Chairman of OPKO.

9.     Defendant, MARC D. GRODMAN, M.D., served as Chairman of the Board and CEO of BRLI since at least 2005 until the company was acquired by OPKO in August 2015.

10.     Defendant CHARLES TODD, served as the Vice President Sales and Marketing and was a member of the Board of Directors for BRLI since at least 2010 until the company was acquired by OPKO in August 2015.

5

## IV.    BACKGROUND

11.    Defendant OPKO is a public company that trades on the NASDAQ under the ticker symbol "OPK."  The Company is a multinational pharmaceutical and diagnostics company.  OPKO's diagnostics business includes BRLI, which is the nation's third-largest clinical laboratory with a core women's health and cancer testing business. Until its acquisition by OPKO in August 2015, BRLI was publicly traded on the NASDAQ under the ticker symbol BRLI.  BRLI is based in New Jersey.  BRLI's clinical laboratory revenues accounted for 83% of OPKO's total 2016 revenue.

12.    Defendant PHILLIP FROST, M.D., age 79, is CEO and Chairman of OPKO.  According to a Schedule 14A Proxy Statement filed by the Company on March 25, 2016, Frost and his investment companies directly and indirectly own 70% of OPKO.

13.    Defendant, MARC D. GRODMAN, M.D., age 65, served as Chairman of the Board and CEO of BRLI since at least 2005 until the company was acquired by OPKO in August 2015.  He abruptly resigned from OPKO in March 2016.

14.    Defendant CHARLES TODD, age 67, served as the Vice President Sales and Marketing and was a member of the Board of Directors for BRLI since at least 2010 until the company was acquired by OPKO in August 2015.  He abruptly left OPKO in August 2017.

## V.    OVERVEW OF DEFENDANTS' PRACTICE OF PROVIDING FREE LAB TESTING TO DOCTORS AND CLINICS

15.    Defendants provide illegal kickbacks to doctors and clinics to induce those doctors and clinics to refer Medicare and Medicaid business to them.  Defendants

promise certain doctors they will either never receive invoices for client billed services, or the invoices will be written off.  In either case, the testing is free to ordering physicians.  As examples of doctors who have been promised by Defendants that they will never receive invoices, or that the invoices will be written off, attached hereto are lists of large Florida, California and New York area physician clients. *See* **Exhibit A**.

## VI.    OVERVEW OF DEFENDANTS' PRACTICE OF WAIVING PATIENT CO-PAYMENTS AND DEDUCTIBLES

16.    In addition to these select doctors, Defendants promise virtually all of their doctor clients that they will never collect co-payments or patient deductible payments from the doctors' patients.  Examples of BRLI/OPKO providers receiving written-off of client or patient invoices (waived co-payments and deductibles) are listed in **Exhibit A**.

17.    Defendants systematically bill Medicare and Medicaid for medically unnecessary tests.  Specifically, Defendants' women's health panels include tests that are pre-selected by Defendants; OPKO sales representatives encourage doctors not to de-select any of the tests.  Because OPKO does not require patients to pay for co-pays or deductibles, the physicians have no incentive to de-select any of the tests.  Because there is no cost to their patients, OPKO's physician clients order OPKO's women's health panels indiscriminately for many of their female patients.  Knowing this, OPKO has designed its test panels to maximize their reimbursement from Medicare.  Defendants then perform and bill Medicare for each of the tests.

18.    Typically, private insurance companies require their patients to make a deductible payment to the laboratory until the patient has met his/her deductible amount

7

for the year, which can range from $2,000 to $5,000. Private insurance companies and some government healthcare programs also generally require that a patient ordering a laboratory test make a co-payment of approximately 20% of allowable charges to the laboratory. Managed care companies, such as Blue Cross/Blue Shield, United Healthcare, Aetna, and Cigna administer a variety of health and welfare benefit plans. As part of their fiduciary responsibilities to those plans, the managed care companies are responsible for controlling healthcare costs. One of the primary ways that managed care companies control costs is by requiring plan members to pay deductibles and co-payments. This provides a safeguard against plan members' health care providers ordering excessive testing or tests not medically useful on a patient by patient basis.

19.     In *Reynolds v. California Dental Service*, the California Court of Appeals upheld the validity of the ban against waiving copayments, writing: "The ban against waiving the copayment is simply the corollary of the rule that a [health care provider] must report his true fee to [the plan]; if a [health care provider] intends to waive the copayment, it is fraudulent for him to report to the [the plan] that his fee includes the copayment." 200 Cal. App. 3d 590, 602 (1988). This conduct is thus not a mere breach of contract between providers and insurers; it is fraud; fraud that leads to unnecessary medical testing, and ultimately, higher premiums for consumers.

20.     In addition to California, other states have made clear the impropriety of waiving co-payments and deductibles. For example, the Florida Statutes provide, in pertinent part:

> (7)(a) **It shall constitute a material omission and insurance fraud**, punishable as provided in subsection

8

(11), for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, **if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge**. With respect to a determination as to whether a service provider has engaged in such general business practice, consideration shall be given to evidence of whether the physician or other provider made a good faith attempt to collect such deductible or copayment.

Fla. Stat. § 817.234(7) (emphasis added).

21.     Similarly, the Colorado Criminal Code prohibits "[b]usiness practices that have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans," for the stated reason "it has the effect of increasing health care costs by removing the incentive that copayments and deductibles create in making the consumer a cost-conscious purchaser of health care" Colorado Revised Statutes Title 18 Criminal Code § 18-13-119.

22.     Under the Medicare program, "Routine waiver of deductibles and co-payments by charge-based providers, practitioners or suppliers is unlawful because it results in . . . false claims . . . [and] excessive utilization of items and services paid for by Medicare.      HHS      OIG      Special      Fraud      Alerts,      available      at https://oig.hhs.gov/fruad/docs/alertsandbulletins/121994.html (Dec. 19, 1994).

23.     One of the principal purposes behind co-payment and deductible requirements is to make patients conscious of the expense of their medical services, and thereby discourage the ordering and performance of unnecessary medical services.  Co-payments and deductibles act as embedded internal controls for payors.  There is no

9

better mechanism to ensure that unnecessary tests are not ordered than requiring patients to pay a portion of the invoices for laboratory tests. Although co-payments and deductibles can be a financial burden to patients, especially to those for whom physicians order expensive women's health panels and cancer tests, service providers are required to make all necessary efforts to collect co-payments from patients, with limited exceptions.

24.    Defendants undermine this safeguard by fraudulently waiving patient deductibles and co-payments. Defendants lure patients from health plans administered by managed care companies by misrepresenting those patients' responsibilities under the plans, promising not to collect deductible or co-payments, and promising not to seek reimbursement for any remaining portion of the patients' bills that are uncovered by the plan.

25.    Waiving co-payments and deductibles is of great benefit to the doctors, who are able to attract and retain patients' business by promising free lab testing. Physicians market free testing to their patients to make their offices more appealing, thereby improving the physicians' overall revenues and ratings. In exchange for this benefit, the doctors order large women's health test panels and cancer testing, including panels for Medicare and Medicaid beneficiaries. The large women's health test panels are designed by OPKO and its predecessor company, BRLI.

26.    The waiver of deductibles and co-payments constitutes illegal remuneration, designed by Defendants to "pull-through" higher-paying Medicare and Medicaid business to Defendants. Defendants tell physicians that there is no reason not to order these large panels because their patients will never have to pay anything.

Furthermore, waiving insurance deductibles and co-payments is explicitly illegal under the laws of several states, including Florida and California, where OPKO has substantial business. These large panels are among the most expensive test panels ever designed.

27.    Patient fees for the GenPath[1] Cervicitis/Vaginitis panel, BRLI's most frequently ordered panel, amount to $2,195, which is what patients are obligated to pay if they have not met their deductible. *See* **Exhibit B**. The co-payment would amount to $439.

28.    Defendant OPKO continues to perpetrate the same fraudulent schemes that BRLI has carried out for years. Defendants actively marketed that it was offering free diagnostic testing services to patients as a means of gaining market share. Defendant Charles Todd was instrumental in educating the sales force on the illegal policy of writing-off patient and ordering physician invoices.

29.    Commercial reference laboratories perform clinical laboratory services, which entail analyses of human body specimens, including blood, to assist physicians in diagnosing human disease and monitoring treatment. OPKO performs clinical laboratory services for patients covered under the federal Medicare program, state Medicaid programs, and private managed care companies. Commercial reference laboratories, like OPKO, obtain requests for clinical tests from physicians, clinics, and hospitals. When the laboratories run these tests, they submit claims for reimbursement to the appropriate payer – Medicare, Medicaid, private insurance, client (ordering physicians, hospitals, and clinics), or patients – for reimbursement, identifying the tests performed by a uniform

---

[1] GenPath Diagnostics is a division of BRLI.

11

Current Procedure Technology ("CPT") code. These claims are typically submitted electronically to government and private payors such as Aetna, Cigna, Blue Cross/Blue Shield, and United Healthcare.

30.  By misleading plan members that they are not responsible for any deductible or co-payments, BRLI increases the volume of its business while simultaneously increasing the damage to the managed care companies and the plans they serve.

31.  As much as 75% of women's health invoices for deductible and co-payments are never sent to patients because Defendants know that waiving deductible and co-payments is illegal, so it is hedging by sending out some, but not all invoices. As part of the company's sales pitch to ordering physicians, BRLI Sales Representatives gave large numbers of the Sales Representatives cards to physicians with the instruction to pass them out to their patients with the instruction that if the patients received an invoice, to simply call the provider's sales representative, who will waive any patient co-payment or deductible payments. *See* **Exhibit C**. Given that nearly half of individuals in the United States do not have the liquidity to pay an unexpected $400 expense without taking on debt, out-of-network charges can be financially devastating to a large share of the population and should be a major policy concern (Board of the Governors of the Federal Reserve System, 2016).

32.  Patient fees for BRLI and now OPKO Cervicitis/Vaginitis panel, the most frequently ordered women's health panel, amount to $2,195, which is what patients are obligated to pay if they have not met their deductible (**Exhibit B**, Women's Health Fee

Schedule). The co-payment would amount to $439. BRLI/OPKO could never have grown at a rate 400% greater than its largest competitors and the industry as a whole, without this illegal billing scheme. It is important to note that BRLI/OPKO has no proprietary testing. The only unique feature of the company is this "free testing for patients" scheme.

33.    The October 1, 2017 OPKO Patient Billing Policies confirmed that patients are never sent to collection and patients with certain out of network insurances are not billed. *See* **Exhibit H**.

34.    Defendant's message is clear: physicians can order any test they want – even medically unnecessary tests – because the costs are picked up by Medicare, Medicaid, other government programs, and insurance companies. Although BRLI and OPKO lost money on uncollected co-payments and deductibles, it more than made up the difference with the profits it earned on the other referral business, such as Medicare, Medicaid, and private insurance.

35.    As a direct result of this policy, patient bad debt was more than 300% of patient net revenue for the years 2011 through 2014 for BRLI. These are the only years for which data was presented in the BRLI Form 10-K's filed with the Securities and Exchange Commission. An internal company document for FY 2013 and 2014, titled "Current Sales Analysis," documented that the company collected only 14% of patient billings in 2013 and 11% in 2014. *See* **Exhibit D**. Laboratories bill their highest fees, their patient fee schedule, to everyone except provider clients. Third party insurance companies pay off their own fee schedules, which is why collections are so low for third

party insurance companies. Patient billings and provider billings should result in approximately 95% collections.

36. BRLI and its officers and directors knew that the illegal policy of writing-off patient and client receivables drove this "bad debt." This policy was set up and monitored on a weekly basis by BRLI's CEO, Defendant Grodman, and CFO, Nicholas Papazicos.

37. The underlying fraud began at BRLI and has continued after BRLI was acquired by OPKO on August 20, 2015. The Compliance Officer at OPKO took steps to discontinue most, but not all, fraudulent activities, in 2017. Without the kickback and illegal billing schemes, gross revenues missed internal projections by $100 million in the quarter ending June 30, 2017 (OPKO 10-Q filed August 8, 2017), resulting in a pre-tax loss of $28.5 (excluding an income tax credit). In an attempt to recover the substantial lost revenue due to elimination of the policy of not billing patients and physicians, OPKO initiated a new scheme. During a conference call when the $100 million shortfall was announced on August 9, 2017, all Clinical Sales Managers were told that patients will still not be required to pay invoices, but they will receive three before the invoice would be automatically written-off, no matter the amount. For example, if a patient receives an invoice of $2,195 for the company's Cervicitis/Vaginitis panel, the patient can just ignore the invoices without any worry about the invoice being sent to collection.

38. OPKO utilizes the same billing scheme for its pharmaceutical drugs. Rayaldee has been described in OPKO's 10-K's as the "feature" of their pharmaceutical segment. The drug is an FDA-approved treatment for secondary hyperparathyroidism in

14

adults with stage 3 or 4 Chronic Kidney Disease and vitamin D insufficiency. It was approved in June 2016 and launched later that year in November.

39.     The price for Rayaldee is $2,800 per month. Utilizing the same tactic BRLI used for lab testing, patients are instructed to call OPKO if they receive a deductible or co-pay invoice. On September 15, 2017, OPKO Connect stated that typically it is zero-dollar deductible or co-pay but it can be as high as $25. With this drug, Medicare is paying $33,600 per year, whereas patients typically pay zero.

40.     As a condition of receiving payment from Medicare and Medicaid, OPKO and BRLI certified, both implicitly and explicitly, their compliance with relevant federal and state statutes and regulations. Rather than abide by these statutes and regulations, Defendants defrauded these programs by inducing physicians to order tests by offering kickbacks, and submitted claims for medically unnecessary tests.

## VII.    OVERVEW OF DEFENDANTS' USE OF THE "LOSS-LEADER / PULL-THROUGH" KICKBACK SCHEME

41.     The "Loss-Leader/ Pull Through" scheme is quite simple. The scheme is founded on the fact that physicians generally do not want to use multiple laboratories depending on the payor because it creates more work for their offices. Labs "hook" physician clients by offering free testing for physicians and their patients. While labs lose money on the free testing, the labs generate tremendous revenue growth and profit from the "Pull Through" Medicare, Medicaid, and private insurance business. These three payors make up approximately 84% of the Company's revenue.

15

42.    The OPKO / BRLI "Loss-leader / Pull-through" kickback scheme is predicated, in part, upon a company circumventing the nearly universal control used by the healthcare industry to prevent indiscriminate ordering of services:  required patient deductible and co-payments.  That aspect of this fraud was described above.

43.    The Company has utilized a second tactic to improperly provide kickbacks to physicians that is even more direct than waiving patient copayments and deductibles:  For at least 10 years, BRLI followed a policy of intentionally agreeing not to require certain physicians to make any payments on their invoices.  This scheme provided direct financial gain to physicians, who bill managed care or patients for the free testing.  Not collecting physician invoices creates a financial windfall for the Company because it ultimately gained the "pull-through" revenue from third party payors on laboratory tests.  Writing-off invoices to ordering physicians is akin to handing them envelopes of cash in exchange for Medicare, Medicaid, and insurance referrals.  Lists of over 100 physicians whose patients get free testing are attached as **Exhibit A**.

## VIII.    OVERVIEW OF DEFENDANTS' UNAUTHORIZED AND INAPPROPRIATE CODING SCHEMES

44.    Defendants' schemes also included adding unauthorized and inappropriate diagnosis codes to trigger payment.

45.    ICD-9/ICD-10 codes (International Classification of Disease, 9th and 10th Edition, Clinical Modification) are used for the classification of disease and conditions and for describing signs, symptoms, and medical circumstances.  These codes are used to indicate the medical necessity of a particular test.  Without appropriate diagnosis codes,

16

CPT codes will not be paid.  ICD-9/ICD-10 codes can only be supplied by the ordering

physician or a representative of that physician.  "Code steering" refers to the illegal act of

steering or directing a physician to supply an ICD-9/ICD-10 code that is payable.

46.     The OIG's compliance guidelines for clinical laboratories, published in

August of 1998, clearly explain that "code steering" violates Medicare statutes and

regulations:

> Laboratories should not: (1) use information provided by
> the physician or other authorized individual from *earlier
> dates* of service (other than standing orders, as discussed
> below at paragraph 4); (2) create diagnosis information that
> has triggered reimbursement in the *past*; (3) use computer
> programs that automatically insert diagnosis codes without
> receipt of diagnostic information from the ordering
> physician or other authorized individual; or (4) **make up
> information for claim submission purposes.** Laboratories
> should: (1) contact the ordering physician, authorized
> person on the physician's staff or other individual
> authorized to order tests to obtain information in the event
> that such information was not provided; and (2) accurately
> translate narrative diagnoses obtained from the physician or
> other authorized individual to ICD-9-CM codes.

OIG Compliance Program Guidance for Clinical Laboratories, 1998

47.     Defendants have engaged in acts of "code steering" by adding diagnosis

codes to invoices that were not provided by the ordering physician or representative.  It is

against the law to use ICD-9/ICD-10 codes for the purpose of causing or increasing

payment for a test.

48.     On at least two occasions BRLI identified that billing department

personnel were adding unauthorized diagnosis codes to invoices for the purpose of

triggering payment.  Such a discovery requires notifying CMS within 60 days and

repayment for the false claims related to the unauthorized diagnosis codes.

49.     In addition to failing to notify CMS and repay the false claims, Defendants did not put in place a system to document all diagnosis codes provided by physicians, as required by the 1967 Clinical Laboratory Improvement Act ("CLIA").

50.     CPT codes are assigned for each test and or test methodology.  Billing an inappropriate CPT code for the test performed, is referred to as upcoding.  It is done for the purpose of increasing reimbursement beyond the appropriate fee for a test or test methodology.

51.     Defendants also upcoded inappropriate CPT codes to trigger increased payment.  On at least two occasions BRLI identified that billing department personnel upcoding for the purpose of increasing reimbursement.  Such a discovery also requires notifying CMS within 60 days and repayment for the false claims related to the inappropriate CPT code.  Defendants made no such notification or repayment.

## IX.    DEFENDANTS FAILED TO PASS ALONG THE LOWEST CHARGE TO MEDICAID PROGRAMS IN FAVOR OF PRIVATE PHYSICIANS

52.     The states of Massachusetts and Georgia require that a laboratory's lowest charge to any payor be passed on to the state Medicaid programs.

53.     **Georgia:**  The Georgia Department of Community Health, Division of Medical Assistance ("Division") is solely responsible for the administration, including reimbursement to providers, of Georgia's Medicaid program.   According to the Division's guidance, providers are required to bill the Division "their usual and customary fees," which was defined as "the lowest rate charged to private patients, other third party payers and insurance carriers, health maintenance organizations or other

18

members of the general public for comparable services . . . includ[ing] any special price

or discounts offered to such patients."  Schedule of Maximum Allowable Payments for

Clinical Laboratory and Anatomical Pathology Services (given force of law by OCGA §

49-4-142).

54.    The lowest rate limitation is also found in the Georgia Medicaid fee

schedule "preamble" and in both the Georgia Medicaid Provider Manual ('Provider

Manual'), and a similar manual specifically directed at laboratories (the Policies And

Procedures For Independent Lab Services Program, or the 'Laboratory Provider

Manual').  Indeed, the Georgia Medicaid fee schedule states:

> As required by Divisional policy, providers must bill the
> Division their usual and customary fees. "Usual and
> customary" means the lowest rate charged to private
> patients, other third party payers and insurance carriers,
> health maintenance organizations or other members of the
> general public for comparable services. The lowest rate
> includes any special price or discounts offered to such
> patients. Providers must not change their fees to the upper
> limits in this schedule, even if these fees are higher than the
> maximum allowable payments for the services rendered.

55.    Schedule of Maximum Allowable Payments for Clinical Laboratory and

Anatomical Pathology Services (emphasis added).

56.    Both the Georgia Medicaid fee schedule and the Medicaid manual make

expressly clear that the lowest charge rule is a condition of payment.  Even more clearly,

the Medicaid Provider Manual states, on its very first page:  "This manual contains basic

information concerning Georgia's Medicaid/PeachCare for Kids program and is intended

for use by all participating providers. Along with the Statement of Participation, this

19

manual encompasses the terms and conditions *for receipt of reimbursement*."    *See*
**Exhibit E** (Provider Manual), at 1 (emphasis added).

57.    Simply put, BRLI/OPKO was required to bill Georgia Medicaid at its
lowest price.  Charges in excess of the maximum allowable fees are subject to recovery
under both OCGA § 49-4-146.1, and the Georgia False Medicaid Claims Act, OGCA §
49-4-168 *et seq*.

58.    **Massachusetts:**    Massachusetts's  Medicaid  program,  known  as
"MassHealth," is administered in part by the Commonwealth's Department of Health
Care Finance and Policy ("DHCFP").  MassHealth's reimbursement procedures are
governed, in part, by Massachusetts's Public Welfare statutes.  Specifically, General
Laws chapter 118E, section 41 prohibits providers from offering "any bribe or rebate,
directly or indirectly, overtly or covertly, in cash or in kind to induce" the purchase of
services for which MassHealth pays.

59.    The Code of Massachusetts Regulations also requires providers to bill
MassHealth lowest of either the provider's "usual and customary charge," the allowable
fees listed in 114.3 CMR 20.05, or the rate recognized under 42 U.S.C. §§ 1395 1(h) for
such tests.  1143. Code Mass. Regs. § 20.04(1).  The Regulations define "usual and
customary charge" as "[t]he lowest fee charged by an independent clinical laboratory for
any laboratory service."  1143. Code Mass. Regs. § 20.05.

60.    Charges in excess of the maximum allowable fees are subject to recovery
under both the Medicaid provider statute, General Laws chapter 118E, § 38, and the
Massachusetts False Claim Act, G.L. c. 12, §§ 5A-5O.

61.    As shown on the chart below, the published women's health panel client fees billed to ordering physicians were therefore required to be billed to these state Medicaid programs.  Rather than comply with state laws, BRLI and OPKO billed the Medicaid programs its highest fees, the patient fees.  This resulted in overcharges between 249% and 272%.

| Cervicitis/ Vaginitis Panel | CPT | Patient Fee | Discounted Client Fee | State Medicaid Fees | |
|---|---|---|---|---|---|
| | | | | MA | GA |
| PAP | 88175 | $95 | $8.44 | $28.75 | $33.28 |
| Human Papilloma Virus (HPV) | 87621 | $150 | $13.33 | $27.88 | $33.28 |
| Chlamydia dubliniensis | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Chlamydia krusei | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Chlamydia tropicalis | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Atobiunm Vaginae | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Chlamydia trachomonis | 87491 | $150 | $13.33 | $27.88 | $24.67 |
| N. Gonorrhea | 87591 | $150 | $13.33 | $27.88 | $24.67 |
| Ureaplasma | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Mycoplasma genitalium | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Trichomonas | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Gardnerella vaginalis | 87511 | $150 | $13.33 | $27.88 | $24.67 |
| Mobiluncus mulierus | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Mobiluncus curtisiis | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Chamydia Glabrata | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Chalmydia parapsilosis | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Chlamydia albacans | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Herpes simplex 1 | 87529 | $150 | $13.33 | $27.88 | $24.67 |
| Herpes simplex 2 | 87529 | $150 | $13.33 | $27.88 | $24.67 |

| Total | | $2,195 | $195 | $531 | $486 |
|---|---|---|---|---|---|
| | | | | | |
| **Note**: All tests bundled into a single panel for physician clients | | | | | |
| | | | | | |
| Percentage of Patient cost | | 9% | | | |
| Amount of Client Discount | | 91% | | | |
| | | Average Overcharge | | 272% | 249% |
| (1) 2007 Fee Schedule | | | | | |
| (2) 2012 Fee Schedule | | | | | |
| (3) 2011 Fee Schedule | | | | | |
| (4) 2015 Fee Schedule | | | | | |

62.    Defendants Grodman and Todd were aware of this requirement because an industry CEO had discussed it with both on several occasions.  In fact, the entire industry was aware of the lowest charge requirements in these states after Quest and LabCorp entered into Settlements in California for almost $300 million in 2011.  Industry publications and the general press widely reported this settlement based on failure to pass on lowest charge, and that similar lawsuits were pending in other states.

63.    Title XIX of the Social Security Act and Title 42 of the Code of Federal Regulations authorize individual states to develop and manage their own Medicaid programs.  Medicaid is a joint federal-state program that provides health care benefits, including laboratory services coverage, for certain groups including the poor and disabled.  The funding for Medicaid is shared between the federal and state governments. Each state is required to implement a state plan containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures.  42 U.S.C. § 1396a.  The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  *Id.* The federal portion of each state's Medicaid payments, known as the Federal Medicaid

22

Assistance Percentage, is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d (b).

## X.    DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY ROUTINELY WAIVING PATIENT CO-PAYMENTS AND DEDUCTIBLES, AND PROVIDING KICKBACKS

64.    Defendants violated the federal False Claims Act by charging Medicare for lab tests that were referred to Defendants by providers because of kickbacks offered to those providers by Defendants.  Defendants' practices are unlawful as kickback schemes, strictly prohibited by Medicare statutes.  Specifically, 42 U.S.C. § 1320a-7b(b)(2)(A) prohibits "Illegal remunerations" for "[w]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) *directly or indirectly, overtly or covertly*, in cash or in kind to any person to induce such person  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . ."  42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added).

65.    Interpretations of this language by the federal authorities provide useful guidance in applying these anti-kickback laws, and establish that Defendants have violated the anti-kickback laws of the United States through the conduct described herein. For example, the federal Department of Health and Human Services, Office of the Inspector General ("OIG"), reaffirmed on May 9, 2008, that:  "[W]hen a laboratory offers or gives an item or service for free *or less than fair market value to a referral source, an inference arises that the item or service is offered to induce the referral of business*."

23

OIG Advisory Opinion No. 08-06. An anti-kickback "violation arises if the discount whatever its size is ***implicitly or explicitly tied*** to referrals of" government-funded business. OIG Opinion Letter, April 26, 2000 (emphasis added).

66.    In October 1994, the OIG issued a Special Fraud Alert, entitled "How Does the Anti-Kickback Statute Relate to Arrangement for the Provision of Clinical Lab Services?" As an example of a situation giving rise to an inference of an illegal kickback, the Special Fraud Alert cited laboratories that waive charges to providers for lab tests of managed care patients (such as the co-payments of patients here). OIG Special Fraud Alert: Arrangements for the Provision of Clinical Laboratory Services (Issued October 1994), available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html. OIG has stated that "[w]henever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business." *Id.*

67.    At all times relevant hereto, Defendants knew that federal law prohibited their giving or receiving these kickbacks. Defendants certified, both explicitly and implicitly, that each claim they submitted to Medicare would fully comply with all statutes and regulations, including the anti-kickback provisions, and that as Medicare providers, they would comply with all pertinent statutes and regulations, including the anti-kickback provisions.

68.    Each claim for payment that Defendants submitted to Medicare, and to the state Medicaid programs of Florida and Colorado, from at least 2007 to the present, that was referred to Defendants by a provider who received from Defendants the

24

remuneration described above constitutes a false claim in violation of the False Claims Act (31 U.S.C. § 3729 et seq.).  Over this time period, Defendants have submitted tens of millions of such claims for payments, and received hundreds of millions of dollars from the Government as a result of these illegal kickbacks.

XI.   **DEFENDANTS VIOLATED THE CALIFORNIA INSURANCE FRAUD PREVENTION ACT BY WAIVING PATIENT CO-PAYMENTS AND DEDUCTIBLES, AND PROVIDING KICKBACKS**

69.   Waiving Patient Co-Pays and Deductibles violated the California Insurance Fraud Prevention Act, Insurance Code § 1871.7(a) and (b), subjecting Defendants to treble damages for the amount of the claim for compensation billed to the insurer.

70.   The effect of Defendants' scheme is to deceive health benefits plans into paying far more for services than the plans are obligated to pay.  By misleading plan members that they are not responsible for any deductible or co-payments, BRLI/OPKO increases the volume of its business while simultaneously increasing the damage to the managed care companies and the plans they serve.

XII.   **DEFENDANTS VIOLATED THE FALSE CLAIMS ACTS BY BILLING FOR MEDICALLY UNNECESSARY LABORATORY TESTS**

71.   Defendants violated the False Claims Act by submitting claims for payment for laboratory testing services that Defendants knew were not medically necessary.   Section 1862 of the Social Security Act provides, in pertinent part:  "Notwithstanding any other provision of this title, no payment may be made under

25

[Medicare] for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. 1395y(a)(1)(A).

72.    Defendants violated 42 U.S.C. 1395y(a)(1)(A) by ordering medically unnecessary laboratory tests. Defendants' practice of pre-selecting tests and depriving doctors of the option to de-select a test violates established Medicare regulations as all diagnostic tests "must be ordered by the physician who furnishes a consultation or treats a beneficiary for a specific medical problem . . .", 42 C.F.R. § 410.32(a), and "tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

73.    Medicare and other federal health care programs require as a condition of coverage that services rendered must be reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1)(A). Defendants presented to Medicare claims for reimbursement of laboratory tests which were neither reasonable nor necessary. As such, each of these claims constitutes a false claim in violation of the False Claims Act (31 U.S.C. § 3729 et seq.). Defendants certified, both explicitly and implicitly, that each claim they submitted to Medicare would fully comply with all statutes and regulations, and that as Medicare providers they would comply with all pertinent statutes and regulations.

74.    Defendants induced doctors to order panels comprised of tests that were not medically reasonable or necessary. Test requisition forms encourage physicians to order bundles, or "panels," of pre-selected tests, not all of which are necessary for each

patient and were redundant tests.  By running the women's health and ACT panels, Defendants were running duplicative and medically unnecessary tests.

75.    As just one of many examples of unnecessary, duplicative tests, BRLI/OPKO's Advanced Cardiovascular testing panel (ACT panel) includes both the Apo-B and LDL-P tests.  Both of these tests measure total LDL particles.  There is no medical benefit to including both of these tests because they provide the same medical information and treatment would not be affected by including both tests.  Both tests are pre-selected by Defendants as part of their ACT panel; doctors do not have the option to de-select one of the tests.  Defendants then perform, and bill Medicare for, each of the tests.  Defendants charge Medicare in excess of $19.95 for the Apo-B test, and $42.93 for the LDL-P test.  Each time they do so, Defendants violate the False Claims Act. Attached as **Exhibit F** is a copy of the ACT report form showing the duplicative tests.

76.    As of October 5, 2015, Medicare guidelines state that cardiovascular risk assessment panels performed on patients with pre-existing risk factors for cardio vascular diseases are not medically reasonable or necessary and, therefore, not covered by Medicare.  Specifically, the new Palmetto GBA Medicare policy (attached hereto as **Exhibit G**) states, *inter alia*, the following:

> CV risk assessment panels, consisting of various combinations of biochemical, immunologic, hematologic, and molecular tests, is considered screening when performed on an asymptomatic patient, and, as such, are not a Medicare benefit. **These CV risk assessment panels are not medically reasonable and necessary if performed on a patient with existing risk factors including but not limited to pre-diabetes or diabetes, smoking, hypertension or hyperlipidemia because these panels are not specific to a patient's lipid abnormality or disease**.

27

Palmetto Medicare Policy Guidelines.

77.     Despite these clear Medicare guidelines, OPKO continues to encourage doctors to order their pre-selected ACT panel tests.

**XIII.    CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**On Behalf of the United States**
**Federal False Claims Act, Presenting False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

78.     Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

79.     Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

80.     Defendants knowingly presented false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare and Medicaid programs that were higher than it was permitted to claim or charge by applicable law.  Among other things, Defendants knowingly submitted false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks.

81.     Defendants knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

28

82.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

### SECOND CAUSE OF ACTION
**On Behalf of the United States Federal False Claims Act, Making or Using False Records or Statements Material to Payment or Approval of False Claims**
**31 U.S.C. § 3729(a)(1)(B)**

83.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

84.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

85.    Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by the Medicare and Medicaid programs that were higher than they were permitted to claim or charge by applicable law.   Among other things, Defendants knowingly submitted false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks.

86.    Defendants knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

29

87.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**THIRD CAUSE OF ACTION**
**(In the Alternative)**
**On Behalf of the United States, Retention of Proceeds to Which Not Entitled**
**31 U.S.C. § 3729(a)(1)(G)**

88.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

89.    In the alternative, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

90.    As discussed above, Defendants received far more money from the Medicare and Medicaid programs than it was entitled to.  Defendants knew that they received more money than it was entitled to, and avoided its obligation to return the excess money to the Government.

91.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**FOURTH CAUSE OF ACTION**
**On Behalf of the State of California, California Insurance Frauds Prevention Act,**
**Employment of Runner, Cappers and Steerers or Other Persons to Procure Patients**
**Cal. Ins. Code § 1871.7(a)**

92.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

93.    Pursuant to California Insurance Code §1871.7(a), it is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure patients for the purpose of submitting a claim to that patient's insurance carrier.

94.    Defendants unlawfully incentivized physicians by waiving copays and deductibles and paying illegal remuneration in the form of kickbacks for the purpose of procuring more physicians to order tests, which were ultimately submitted to Medicare and private insurance companies for reimbursements. Defendants conspired together, and did so in order to submit claims for payment to insurance carriers in violation of Cal. Ins. Code §1871.7(a).

95.    Because the claims submitted to medical insurers by Defendants were procured by runners, cappers, and steerers and other persons, these claims were false and fraudulent under the California Insurance Frauds Prevention Act.

96.    This conduct was a substantial factor causing damages detailed herein.

**FIFTH CAUSE OF ACTION**
**On Behalf of the State of California, California Insurance Frauds Prevention Act,**
**Presenting or Causing to be Presented False or Fraudulent Claims for the Payment**
**of An Injury Under A Contract of Insurance**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(1)**

97.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

31

98.     Defendants have all either knowingly presented or caused to be presented false and fraudulent claims for reimbursement of tests, or conspired to present or cause to be presented such false and fraudulent claims.

99.     These claims were fraudulent because:

•     Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

•     Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

•     Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

100.     Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

101.     This conduct was a substantial factor causing damages detailed herein.

## SIXTH CAUSE OF ACTION
**On Behalf of the State of California, California Insurance Frauds Prevention Act, Knowingly Preparing or Making Any Writing in Support of a False or Fraudulent Claim**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(5)**

102.     Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

103.     Defendants have all either knowingly prepared, made, or subscribed a writing with an intent to present or use it, or to allow it to be presented, in support of false

32

and fraudulent claims for the reimbursement of tests performed on patients, or have aided, abetted, and solicited, or conspired to make, or subscribe such a writing.

104.    These writings include bills for payment presented to insurance carriers for payment, and invoices prepared in support of such bills for payment. Such bills for payment constitute false or fraudulent claims because through those bills:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

105.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

106.    This conduct was a substantial factor causing damages detailed herein.

### SEVENTH CAUSE OF ACTION
**On Behalf of the State of California, California Insurance Frauds Prevention Act, Knowingly Making or Causing to be Made Any False or Fraudulent Claim for Payment of a Health Benefit**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(6)**

107.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

108.    Defendants have all either knowingly presented or caused to be presented false and fraudulent claims for reimbursement of tests performed on patients, or have

33

aided, abetted, and solicited, or conspired to present or cause to be presented such false and fraudulent claims.

109.    The claims were false or fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

110.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

111.    This conduct was a substantial factor causing damages detailed herein.

**EIGHTH CAUSE OF ACTION**
**On Behalf of the State of California, California Insurance Frauds Prevention Act, Soliciting, Accepting, and Referring Business To or From an Individual or Entity That Intends to Violate Section 550 of the Penal Code or Section 1871.4 of the Insurance Code**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 549**

112.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

113.    Defendants have solicited, accepted, or referred business to or from an entity or individual that intended to violate Section 550 of the Penal Code or Section 1871.4 of the Insurance Code.

34

114.    The claims were false or fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

115.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

116.    This conduct was a substantial factor causing damages detailed herein.

### NINTH CAUSE OF ACTION
**On Behalf of the State of Florida**
**Florida False Claims Act, Presenting False Claims Florida Statute § 68.082(2)(a)**
**Against All Defendants**

117.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

118.    At all times relevant hereto, Defendants, and each of them, knowingly (as defined in defined in Florida Statute section 68.082, subdivision (1)(c)) presented, or caused to be presented, claims for payment or approval in the form of invoices submitted to Medicaid for Florida Medicaid business that was obtained by means of, and as a result of, illegal kickbacks.

35

119.    Defendants' conduct violated Florida Statute section 68.082, subsection (2)(a), and was a substantial factor in causing the State to sustain damages in an amount according to proof pursuant to Florida Statute section 68.082, subsection (2).

### TENTH CAUSE OF ACTION
### On Behalf of the State of Florida
### Florida False Claims Act, Making or Using False Records or Statements To Obtain Payment or Approval of False Claims Florida Statute § 68.082(2)(b)
### Against All Defendants

120.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

121.    At all times relevant hereto, Defendants, and each of them, knowingly (as defined in Florida Statute section 68.082, subdivision (1)(c)) made or used, or caused to be made or used, false records or statements to obtain payment or approval of false claims.  Specifically, Defendants billed the AHCA for Florida Medicaid business that was obtained by means of, and as a result of, illegal kickbacks.

122.    Defendants' conduct violated Florida Statute section 68.082, subsection (2)(b), and was a substantial factor in causing the State to sustain damages in an amount according to proof pursuant to Florida Statute section 68.082, subsection (2).

### ELEVENTH CAUSE OF ACTION
### On Behalf of the Commonwealth of Massachusetts
### Massachusetts False Claims Act, Presenting False Claims
### Massachusetts General Laws chapter 12, § 5B(1)
### Against All Defendants

123.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

124.    At all times relevant hereto, Defendants, and each of them, knowingly (as defined in Massachusetts General Laws chapter 12, section 5A) presented, or caused to be presented, claims for payment or approval in the form of invoices submitted to MassHealth that reflected prices higher than the maximum reimbursement rates allowed by law.  Specifically, Defendants, and each of them, submitted or caused to be submitted invoices for payment of MassHealth covered clinical laboratory tests at amounts grossly in excess of the amounts contemplated by law, resulting in great financial loss to the Commonwealth.

Defendants' conduct violated Massachusetts General Laws chapter 12, section 5B(1), and was a substantial factor in causing the Commonwealth to sustain damages in an amount according to proof pursuant to Massachusetts General Laws chapter 12, section 5B.

**TWELTH CAUSE OF ACTION**
**Massachusetts False Claims Act, Making or Using False Records or Statements**
**To Obtain Payment or Approval of False Claims**
**J.  Massachusetts General Laws chapter 12, § 5B(2)**
**Against All Defendants**

125.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

126.    At all times relevant hereto, Defendants, and each of them, knowingly (as defined in Massachusetts General Laws chapter 12, section 5A) made or used, or caused to be made or used, false records or statements to obtain payment or approval of false claims.  Specifically, Defendants billed the DHCFP at rates equal to or in excess of the maximum rates specified by the MassHealth rate schedule, rather than the discounted rates offered to others.

127.    Defendants' conduct violated Massachusetts General Laws chapter 12, section 5B(2), and was a substantial factor in causing the Commonwealth to sustain damages in an amount according to proof pursuant to Massachusetts General Laws chapter 12, section 5B.

**THIRTEENTH CAUSE OF ACTION**
**On Behalf of the Commonwealth of Massachusetts**
**Massachusetts False Claims Act, Retention of Proceeds Of Inadvertently Submitted False Claims Massachusetts General Laws chapter 12, § 5B(9)**
**Against All Defendants**

128.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

129.    Plaintiffs are informed and believe, and on that basis allege, that as to each claim for MassHealth reimbursement submitted for a test as to which a Defendant charged other clients less than it charged to DHCFP, each Defendant: (a) was a beneficiary of an inadvertent submission of a false claim to DHCFP; (b) subsequently discovered the falsity of the claim; (c) and failed to disclose the false claim to DHCFP within a reasonable time after discovery of the false claim.  Specifically, each Defendant billed DHCFP at rates equal to or in excess of the maximum rates specified by the MassHealth rate schedule, rather than the discounted rates offered to others, and on discovering that it had done so, failed to promptly disclose the overcharge to DHCFP and make restitution therefor.

130.    Defendants' conduct violated Massachusetts General Laws chapter 12, section 5B(9) and was a substantial factor in causing the Commonwealth to sustain

damages in an amount according to proof pursuant to Massachusetts General Laws chapter 12, section 5B.

## FOURTEENTH CAUSE OF ACTION
### On Behalf of the State of Georgia
### Georgia False Medicaid Claims Act, Presenting False Claims
### OCGA § 49-4-168.1(a)(1)
### Against All Defendants

131.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

132.    At all times relevant hereto, Defendants, and each of them knowingly (as defined in OCGA § 49-4-168(2)) presented, or caused to be presented, claims for payment or approval in the form of invoices submitted to Medicaid that reflected prices higher than the maximum reimbursement rates allowed by law. Specifically, Defendants, and each of them, submitted or caused to be submitted invoices for payment in excess of the amounts contemplated by law, resulting in great financial loss to the State.

## FIFTEENTH CAUSE OF ACTION
### On Behalf of the State of Georgia
### Georgia False Medicaid Claims Act, Making or Using False Records or Statements
### Against All Defendants

133.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

134.    At all times relevant hereto, Defendants, and each of them, knowingly (as defined in OCGA § 49-4-168(2)) made or used, or caused to be made or used, false records or statements to obtain payment or approval of false claims. Specifically, Defendant billed the Division at rates equal to or in excess of the maximum rates specified by the Medicaid rate schedule, rather than the discounted rates offered to others.

39

135.    Defendants' conduct violated OCGA § 49-4-168.1(a)(2), and was a substantial factor in causing the State to sustain damages in an amount according to proof pursuant to OCGA § 49-4-168.1(a).

## XIV.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, by and through the Relator, pray judgment in its favor and against Defendants as follows:

136.    That judgment be entered in favor of Plaintiffs UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF GEORGIA, COMMONWEALTH OF MASSACHUSETTS, and STATE OF FLORIDA *ex rel.* FBG, LLC, and against Defendants according to proof, damages in the amount of:

      i.    Triple the amount of damages sustained by the Government;

      ii.    Civil penalties as provided by statute for each false claim;

      iii.    Recovery of costs;

      iv.    Pre- and post-judgment interest;

      v.    Such other and further relief as the Court deems just and proper;

137.    Further, Relator, on its own behalf, requests that Relator receive such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF GEORGIA, COMMONWEALTH OF MASSACHUSETTS, and STATE OF FLORIDA, plus an amount for reasonable expenses incurred, plus reasonable attorneys'

fees and costs of this action. Relator requests that its percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

## XV.    DEMAND FOR JURY TRIAL

Relator FBG, LLC hereby demands a jury trial on all issues so triable.

Respectfully Submitted,

January 26, 2018                         **LEVIN, PAPANTONIO, THOMAS,**
                                         **MITCHELL, RAFFERTY & PROCTOR P.A.**

By: _____

CHRISTOPHER G. PAULOS
Florida Bar #91579
MATTHEW D. SCHULTZ
Florida Bar #640328 (MDFL Admission Pending)
PETER MOUGEY
Florida Bar #191825
W. TROY BOUK
Florida Bar # 0043384 (MDFL Admission
Pending)
**LEVIN, PAPANTONIO, THOMAS,**
**MITCHELL, RAFFERTY & PROCTOR P.A.**
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7067
Facsimile: (850) 436-6066
E-Mail:    cpaulos@levinlaw.com
               mschultz@levinlaw.com
               pmougey@levinlaw.com
               tbouk@levinlaw.com

NIALL P. McCARTHY (CA SBN 160175)
(to be admitted *pro hac vice*)
Trial Counsel
JUSTIN T. BERGER (CA SBN 250346)
(to be admitted *pro hac vice*)
PHYRA M. McCANDLESS (CA SBN 260021)
(to be admitted *pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, California  94010
Telephone: (650) 697-6000

42

Facsimile:  (650) 692-3606
E-Mail:      nmccarthy@cpmlegal.com
                jberger@cpmlegal.com
                pmccandless@cpmlegal.com

*Attorneys for Relator*