## IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF GEORGIA, COMMONWEALTH OF MASSACHUSETTS, and STATE OF FLORIDA** *ex rel.* **FBG, LLC**,

        Plaintiffs,

    **vs.**

**OPKO HEALTH, INC. LLC**, a corporation, **BIOREFERENCE HEALTH, LLC f/k/a BIOREFERENCE LABORATORIES, INC.**, a corporation, **PHILLIP FROST, M.D.**, an individual, **MARC D. GRODMAN, M.D.,** an individual, **CHARLES TODD,** an individual, and **ADAM LOGAL**, an individual.

        Defendants.

Civil Case No. 3:18-cv-166-BDJ-JBT

## FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FALSE CLAIMS ACT

## DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 1

II.     JURISDICTION AND VENUE ..................................................................... 2

III.    PARTIES ....................................................................................................... 3

IV.     APPLICABLE LAW ..................................................................................... 5

        A.      The Federal False Claims Act ........................................................... 5

        B.      The Anti-Kickback Statute ................................................................ 6

        C.      State False Claims Acts .................................................................... 7

        D.      California Insurance Frauds Prevention Act ...................................... 7

V.      FEDERAL AND STATE FUNDED HEALTHCARE PROGRAMS ............ 8

        A.      The Medicare Program ...................................................................... 8

        B.      The Medicaid Program .................................................................... 11

VI.     OVERVIEW AND DETAILS OF THE SCHEMES ................................... 12

        A.      Unlawful Kickbacks in Violation of the Anti-Kickback Statute ............ 12

                1)      Systematic Practice of Waiving Co-Payments and Deductibles ............... 13

                        a.      Defendants Undermine the Medicare, Medicaid, & Private
                                Insurance Safeguards ...................................................... 13

                        b.      The Co-Pay Waiver Scheme ............................................ 15

                2)      Defendants' "Loss-Leader / Pull Through" Kickback Scheme ................. 27

        B.      Defendants' Unauthorized and Fraudulent Coding Schemes .................. 30

                1)      Overview of Code Steering Scheme .............................................. 30

                2)      Overview of Upcoding Scheme ................................................... 32

        C.      Defendants Violated the False Claims Act by Billing for Medically
                Unnecessary Laboratory Tests ......................................................... 33

        D.      Defendants Failed to Pass Along the Lowest Charge to Medicaid Programs in
                Favor of Private Physicians and Health Plans ..................................... 35

                1)      Governing Authority .................................................................. 35

                2)      BRLI / OPKO's Medicaid Violations ........................................... 37

        E.      Defendants Violated the California Insurance Fraud Prevention Act ......... 39

VII.    CAUSES OF ACTION ..........................................................................................41

FIRST CAUSE OF ACTION
On Behalf of the United States
Federal False Claims Act, Presenting False Claims
31 U.S.C. § 3729(a)(1)(A) ..................................................................41

SECOND CAUSE OF ACTION
On Behalf of the United States
Federal False Claims Act, Making or Using False Records or Statements Material
to Payment or Approval of False Claims
31 U.S.C. § 3729(a)(1)(B) ..................................................................42

THIRD CAUSE OF ACTION
(In the Alternative) On Behalf of the United States
Retention of Proceeds to Which Not Entitled
31 U.S.C. § 3729(a)(1)(G) ..................................................................43

FOURTH CAUSE OF ACTION
On Behalf of the State of California
California Insurance Frauds Prevention Act, Employment of Runner, Cappers and
Steerers or Other Persons to Procure Patients
Cal. Ins. Code § 1871.7(a)
 Against All Defendants ................................................................43

FIFTH CAUSE OF ACTION
On Behalf of the State of California
California Insurance Frauds Prevention Act, Presenting or Causing to be
Presented False or Fraudulent Claims for the Payment of An Injury Under a
Contract of Insurance, Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(1)
Against All Defendants ..................................................................44

SIXTH CAUSE OF ACTION
On Behalf of the State of California
California Insurance Frauds Prevention Act, Knowingly Preparing or Making Any
Writing in Support of a False or Fraudulent Claim, Cal. Ins. Code § 1871.7(b);
Cal. Pen. Code § 550(a)(5)
Against All Defendants ..................................................................45

SEVENTH CAUSE OF ACTION
On Behalf of the State of California
California Insurance Frauds Prevention Act, Knowingly Making or Causing to be
Made Any False or Fraudulent Claim for Payment of a Health Benefit, Cal. Ins.
Code § 1871.7(b); Cal. Pen. Code § 550(a)(6)
Against All Defendants ..................................................................46

EIGHTH CAUSE OF ACTION
    On Behalf of the State of California
    California Insurance Frauds Prevention Act, Soliciting, Accepting, and Referring
    Business to or From an Individual or Entity That Intends to Violate Section 550 of
    the Penal Code or Section 1871.4 of the Insurance Code Cal. Ins. Code §
    871.7(b); Cal. Pen. Code § 549
    Against All Defendants ................................................................................................48

NINTH CAUSE OF ACTION
    On Behalf of the State of Florida
    Florida False Claims Act, Presenting False Claims Florida Statute § 68.082(2)(a)
    Against All Defendants ................................................................................................49

TENTH CAUSE OF ACTION
    On Behalf of the State of Florida
    Florida False Claims Act, Making or Using False Records or Statements to Obtain
    Payment or Approval of False Claims Florida Statute § 68.082(2)(b)
    Against All Defendants ................................................................................................50

ELEVENTH CAUSE OF ACTION
    On Behalf of the Commonwealth of Massachusetts
    Massachusetts False Claims Act, Presenting False Claims Massachusetts General
    Laws chapter 12, § 5B(1)
    Against All Defendants ................................................................................................51

TWELFTH CAUSE OF ACTION
    Massachusetts False Claims Act, Making or Using False Records or Statements
    To Obtain Payment or Approval of False Claims Massachusetts General Laws
    chapter 12, § 5B(2)
    Against All Defendants ................................................................................................52

THIRTEENTH CAUSE OF ACTION
    On Behalf of the Commonwealth of Massachusetts Massachusetts False Claims
    Act, Retention of Proceeds of Inadvertently Submitted False Claims
    Massachusetts General Laws chapter 12, § 5B(9) Against All Defendants ...........54

FOURTEENTH CAUSE OF ACTION
    On Behalf of the State of Georgia Georgia False Medicaid Claims Act, Presenting
    False Claims OCGA § 49-4-168.1(a)(1)
    Against All Defendants ................................................................................................55

FIFTEENTH CAUSE OF ACTION
    On Behalf of the State of Georgia Georgia False Medicaid Claims Act, Making or
    Using False Records or Statements
    Against All Defendants ................................................................................................56

VIII.  PRAYER FOR RELIEF ........................................................................................................... 57

IX.  DEMAND FOR JURY TRIAL ................................................................................................ 59

Plaintiffs UNITED STATES OF AMERICA ("United States"), STATE OF CALIFORNIA, STATE OF GEORGIA, COMMONWEALTH OF MASSACHUSETTS, and STATE OF FLORIDA, by and through Relator FBG, LLC, allege as follows:

## I.   <u>INTRODUCTION</u>

1.      This is a *qui tam* action for violation of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3150 *et seq*., to recover treble damages, civil penalties and all other recoveries for fraudulent Medicare and Medicaid billings.  Relator also brings claims under California Insurance Frauds Prevention Act, Florida False Claims Act, Massachusetts False Claims Act, and Georgia False Medicaid Claims Act, to recover fraudulent charges on behalf of their respective States.

2.      Over the past decade, OPKO HEALTH, INC., a publicly traded Florida company, and BIOREFERENCE HEALTH, LLC f/k/a BIOREFERENCE LABORATORIES, INC., a formerly publicly traded New Jersey company, which was acquired by OPKO in August 2015, and its owners and executives PHILLIP FROST, M.D., MARC D. GRODMAN, M.D., CHARLES TODD, and ADAM LOGAL (collectively, "Defendants"), have perpetrated a multifaceted fraud on U.S. taxpayers through various schemes designed to defraud Medicare and Medicaid.

3.      The *first* scheme involves OPKO / BRLI's systematic waiver of patient co-payments and deductibles.  Approximately 87.5% of patient account receivables are ultimately written off, effectively providing free testing services.  **Exhibit 1.**  Pursuant to well-established Medicare rules, "routine waiver of deductibles and co-payments by charge-based providers, practitioners or suppliers is unlawful because it results in . . . false claims . . . [and] excessive utilization of items and services paid for by Medicare."[1]

4.      The *second* scheme pertains to OPKO / BRLI's use of a "Loss-leader Pull-through" kickback scheme.  In essence, Defendants provide unlawful remuneration to physicians

_____

[1] HHS OIG Special Fraud Alerts, https://oig.hhs.gov/fruad/docs/alertsandbulletins/121994.html (Dec. 19, 1994).

in order to gain their business in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  Specifically, the inducement involves waiving physician invoices and not billing physicians for services (in addition to waiving patient copayments and deductibles as detailed above).  These activities effectively provided the tests for free (or at steep discounts) to physicians and patients.

5.       The *third* scheme includes the use of unauthorized diagnostic codes to trigger payments and use of improper CPT upcoding to increase revenue.

6.       The *fourth* scheme is the marketing of tests that are neither reasonable nor necessary to diagnose disease or treat patients.

7.       The *fifth* scheme involves the failure to pass on lowest charges to State Medicaid programs as required by Georgia, Florida, and Massachusetts law.

8.       These practices, which are interrelated and overlapping, resulted in Defendants claiming and receiving millions of dollars in reimbursements from Medicare, Tricare, and Medicaid.

9.       This *qui tam* suit is based on non-public information personally known to Relator FBG, LLC.  To the extent any alleged public disclosure has occurred, Relator is the original source as defined by 31 U.S.C. § 3730(e)(4)(B).

## II.    JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 31 U.S.C. §§ 3730(b) and 3732(a), which confer jurisdiction on this Court for actions brought under the Federal False Claims Act and authorize nationwide service of process.  This Court has jurisdiction over the state-law claims pursuant to 31 U.S.C. § 3732(b), which provides for "jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730."

11.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), as all Defendants transact business in the Middle District of Florida.

### III.   PARTIES

12.     The Plaintiffs in this action are the UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF GEORGIA, COMMONWEALTH OF MASSACHUSETTS, and STATE OF FLORIDA, by and through Relator FBG, LLC.

13.      Relator FBG, LLC is a limited liability company.  The members of FBG, LLC are Neville Brooks, Richard Prendergast, and Chris Riedel.

14.     Neville Brooks is the former BRLI Assistant Vice President for Internal Audit. He worked at BRLI and OPKO (following the acquisition) from 2007 until September 2016, when he was terminated after attempting to stop OPKO's and BRLI's illegal activities.  Mr. Brooks has direct knowledge of fraudulent activities at OPKO and BRLI and personnel involved in the fraudulent activities.

15.     Richard Prendergast is a former OPKO Clinical Laboratory Division Sales Manager for California.  In 2003, Mr. Prendergast co-founded Hunter Labs.  BRLI acquired Hunter Labs in August of 2013.  At BRLI, Mr. Prendergast took on the position of Clinical Laboratory Division Sales Manager for Northern California and maintained his role when OPKO acquired BRLI in 2015.  As Clinical Laboratory Sales Manager, Mr. Prendergast supervised six sales representatives, including two sales representatives that also worked in the Women's Health Division.  In his capacity, he has direct knowledge of sales practices that are the underpinning of the "Loss-leader/ Pull-through" kickback scheme, and other fraudulent activities at OPKO.  Mr. Prendergast was laid off in July of 2022.

16.     Chris Riedel was a long-time laboratory CEO and is now a successful whistleblower specializing in *qui tam* healthcare frauds with a focus on laboratory billing cases.

17.     Defendant OPKO HEALTH, INC. ("OPKO") is a Delaware corporation with its principal place of business in Florida.  OPKO is a multinational pharmaceutical and diagnostics

company.  OPKO is a public company that trades on the NASDAQ under the ticker symbol "OPK."  OPKO's diagnostics business includes BIO-REFERENCE HEALTH, LLC (f/k/a BIOREFERENCE LABORATORIES, INC.), which is the nation's third-largest clinical laboratory with a core women's health and cancer testing business.

18.      Defendant BIOREFERENCE HEALTH, LLC f/k/a BIOREFERENCE LABORATORIES, INC. ("BRLI") is a New Jersey corporation with its principal place of business in New Jersey.  On August 20, 2015, OPKO announced the completion of the acquisition of BRLI.  As a result, BRLI is a wholly owned subsidiary of OPKO.  Until its acquisition by OPKO in August 2015, BRLI was publicly traded on the NASDAQ under the ticker symbol BRLI.  BRLI has an international presence in more than 50 countries, including laboratory locations in: California, Florida, Georgia, Maryland, Massachusetts, New Jersey, New York, Ohio, Rhode Island, and Texas.  BRLI's clinical laboratory revenues accounted for 83% of OPKO's total 2016 revenue.

19.      Defendant PHILLIP FROST, M.D. is CEO and Chairman of OPKO.  According to a Schedule 14A Proxy Statement filed by the Company on March 25, 2016, FROST and his investment companies directly and indirectly own 70% of OPKO.

20.      Defendant, MARC D. GRODMAN, M.D. served as Chairman of the Board and CEO of BRLI since at least 2005 until the company was acquired by OPKO in August 2015.  He abruptly resigned from OPKO in March 2016.

21.      Defendant CHARLES TODD served as Senior Vice President  Sales and Marketing and was a member of the Board of Directors for BRLI since at least 2010 until the company was acquired by OPKO in August 2015.  He abruptly left OPKO in August 2017.

22.      Defendant ADAM LOGAL has served as OPKO's Sr. Vice President and Chief Financial Officer since March 2014, Vice President of Finance, Chief Accounting Officer and Treasurer from July 2012 until March 2014, and Director of Finance, Chief Accounting Officer and Treasurer from March 2007 until July 2012.

/ / /

IV.     **APPLICABLE LAW**

        **A.  The Federal False Claims Act**

    23.    The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, section 4(f), 123 Stat. 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).  The FCA also makes a person liable to the United States government for three times the amount of damages which the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).

    24.    The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

    25.    The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information;" (2) "acts in deliberate ignorance of the truth or falsity of the information;" or (3) "acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1)(B).

**B. The Anti-Kickback Statute**

26.     The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that providing things of value to those who can influence health care decisions may corrupt their professional judgment and result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.  The statute was first enacted in 1972, and was strengthened in 1977, 1987, and 2010, to ensure that kickbacks disguised as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93; Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119.

27.     The AKS prohibits any individual or entity from knowingly and willfully offering or paying any "remuneration," directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce a referral or recommendation for any item or service reimbursed in whole or in part under a federal healthcare program.  42 U.S.C. § 1320a-7b(b)(2).  It also prohibits the solicitation or receipt of any "remuneration" in return for a referral or recommendation for any item or service reimbursed in whole or in part under a federal healthcare program.  42 U.S.C. § 1320a-7b(b)(1).  "Remuneration," under the AKS, means anything of value.  Accordingly, under the statute, subject only to "safe harbor" exceptions not applicable here, it is unlawful for pharmacies (including Defendants) to give or receive anything of value in exchange for referrals or recommendations.  *Id*.

28.     Compliance with the AKS is a precondition to participation as a health care provider under federal health care programs, including Medicare and Medicaid.

29.     A claim that includes items resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act.  42 U.S.C. § 1320a-7b(g).  Such a claim is false or fraudulent under the FCA because providers of such items are ineligible to participate in government health care programs and because the government would not have paid such claims had it known of the kickbacks.

### C.  State False Claims Acts

30.     Various states have enacted statutes that prohibit similar conduct as that prohibited by the Federal FCA, allow plaintiffs to bring an action on the States' behalf, and provide analogous remedies to those provided in the Federal FCA.  As set forth below, Defendants' actions alleged herein also constitute violations of the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq*.; the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 *et seq*.; the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq*.; and the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 §§ 5 *et seq.*

### D.  California Insurance Frauds Prevention Act

31.     The California Insurance Frauds Prevention Act ("CIFPA"), California Insurance Code § 1871.7, creates civil liability for any violation of California Penal Code § 550, which makes it unlawful to "[k]nowingly prepare, make, or subscribe any writing, with the intent to present or use it, or allow it to be presented, in support of any false or fraudulent claim" or to "[k]nowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit."  Cal. Penal Code § 550(a)(5) and (6).  It is additionally unlawful to aid, abet, solicit, or conspire with any person to do either of the above.  *Id*.

32.     In addition, the CIFPA makes it unlawful to "employ runners, cappers, steerers, or other persons . . . to procure clients or patients to perform or obtain services or benefits under a contract or insurance or that will be the basis for a claim against an insured individual or his or her insurer," Cal. Ins. Code § 1871.7(a), and creates civil liability for any person who violates that provision. Cal. Ins. Code § 1871.7(b).  A "runner, capper, or steerer" is a person who:

> "receives a pecuniary benefit from a practitioner or health care service provider, whether directly or indirectly, to solicit, procure or attempt to procure a client, patient, or customer at the direction or request of, or in cooperation with, a practitioner or health care service provider whose purpose is to obtain benefits under a contract of insurance or to assert a claim against an insured or an insurer for providing services to the client, patient, or customer."

National Ass'n. of Ins. Comm'rs., *Automobile Ins. Fraud Guidelines*, § 2(A). Accordingly, under the CIFPA, it is unlawful for any person or entity to provide a pecuniary benefit—a kickback—to a health care practitioner in order to induce that practitioner to refer a patient whose care will be reimbursed by an insurance company.

33.     Because it is unlawful to employ runners, cappers, or steerers—and, therefore, to provide kickbacks—to obtain referrals of patients for the purpose furnishing services to those patients that will be reimbursed by private insurers, every claim to a private insurer that is tainted by an illegal kickback is a violation section 550 of the Penal Code.

34.     Moreover, under section 1871.7 of the Insurance Code and Section 550 of the Penal Code, a claim "characterized in any way by deceit" is fraudulent whether or not it contains factual falsehoods. *People ex rel. Allstate Ins. Co. v. Suh,* 37 Cal.App.5th 253, 260 (2019) (*quoting State ex rel. Wilson v. Superior Court*, 227 Cal.App.4th 579, 601 (2014), as modified on denial of reh'g (July 25, 2014)).

35.     Under the CIFPA, every person who violates California Penal Code § 550 is subject to civil penalties between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim for compensation submitted pursuant to the contract of insurance. Cal. Ins. Code § 1871.7(b). This penalty is assessed for "[e]ach fraudulent claim presented to an insurance company by a defendant." *Id.*

## V.     FEDERAL AND STATE FUNDED HEALTHCARE PROGRAMS

### A.     The Medicare Program

36.     Congress established the Medicare program, or Title XVIII of the Social Security Act, in 1965 with the goal of providing nationalized health coverage for Americans aged 65 or older. *See* 42 U.S.C. §§ 1395 *et seq.* In addition to the elderly, a large portion of Medicare's

patient population is disabled.  In 2015, Medicare covered roughly 55 million Americans, either through the traditional federally administered Medicare program or through private health plans, also known as Medicare Advantage plans.  Medicare is funded through the Medicare Trust Fund, which relies on workers' payroll deductions and government funds.

37.     The United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, direct and manage the Medicare program.

38.     Medicare has four parts: Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of hospital services and post-hospital nursing facility care.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, such as services provided to Medicare patients by physicians, laboratories, and diagnostic testing facilities. *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s). Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

39.     To administer the Medicare program, private insurance companies act as agents of the Department of Health and Human Services, making payments on behalf of the program beneficiaries and providing other administrative services.  42 U.S.C. §§ 1395h and 1395u.  These companies are called "carriers."  *See* 42 C.F.R. § 421.5(c).  Through local carriers, Medicare establishes and publishes the criteria for determining what services are eligible for reimbursement or coverage.  This information is made available to the providers who seek reimbursement from Medicare.

40.     Medicare reimburses health care providers for the costs of providing covered health services to Medicare beneficiaries.  *See* 42 U.S.C. § 1395x(v)(1)(A).  To bill Medicare Part B, a provider must submit an electronic or hard copy claim form called the CMS 1500 (formerly known as HCFA 1500) to the appropriate Medicare carrier.  These forms describe, among other things, the provider, the patient, the referring physician, the service(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged.  The

provider certifies on the CMS 1500 claim form that the information provided is truthful and that the services billed on the form were "medically indicated and necessary."  The provider certifies in the UB-04 that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate, and complete."

41.    In addition, each Medicare provider must sign a provider agreement and by so doing must agree to comply with all Medicare requirements including the fraud and abuse provisions.  A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

42.    Defendants' practices are unlawful as kickback schemes, strictly prohibited by Medicare statutes.  Specifically, 42 U.S.C. § 1320a-7b(b)(2)(A) prohibits "Illegal remunerations" for "[w]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . ."  42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added).

43.    Interpretations of this language by the federal authorities provide useful guidance in applying these anti-kickback laws and establish that Defendants have violated the anti-kickback laws of the United States through the conduct described herein.  For example, the Federal Department of Health and Human Services, Office of the Inspector General ("OIG"), reaffirmed on May 9, 2008, that "when a laboratory offers or gives an item or service for free *or less than fair market value to a referral source, an inference arises that the item or service is offered to induce the referral of business.*"  OIG Advisory Opinion No. 08-06.  An anti-kickback "violation arises if the discount whatever its size is *implicitly or explicitly tied* to referrals of" government-funded business.  OIG Opinion Letter, April 26, 2000 (emphasis added).

44.    In October 1994, the OIG issued a Special Fraud Alert, entitled "How Does the Anti-Kickback Statute Relate to Arrangement for the Provision of Clinical Lab Services?"  As an

example of a situation giving rise to an inference of an illegal kickback, the Special Fraud Alert cited laboratories that waive charges to providers for lab tests of managed care patients (such as the deductible and/or co-payments of patients here).  OIG Special Fraud Alert: Arrangements for the Provision of Clinical Laboratory Services (Issued October 1994), available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.  OIG has stated that "[w]henever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business."  *Id*.

45.     Medicare and other federal health care programs also require as a condition of coverage that services rendered must be reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1)(A).  Defendants presented to Medicare claims for reimbursement of laboratory tests which were neither reasonable nor necessary.  As such, each of these claims constitutes a false claim in violation of the False Claims Act (31 U.S.C. § 3729 et seq.).

### B. The Medicaid Program

46.     Medicaid was also created in 1965 under Title XIX of the Social Security Act.  It is a public assistance program providing for payment of medical expenses for low-income and disabled patients.  Funding for Medicaid is shared between the Federal Government and those states participating in the program.  Thus, under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. §§ 1396 *et seq.*, federal money is distributed to the states, which in turn provide certain medical services to the poor.

47.     Federal Medicaid regulations require each state to designate a single state agency responsible for its Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary").  Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid programs.

48.     Each provider that participates in the Medicaid program must sign a provider agreement with his or her state.  All institutional providers must similarly agree "to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200) [including the Anti-Kickback provision cited below], and any applicable rules or regulations promulgated by DHCS pursuant to these Chapters."  Further, the provider must agree "that it shall not engage in or commit fraud or abuse."  "Fraud" is defined as "intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or herself or some other person" and includes "any act that constitutes fraud under applicable federal or state law."  "Abuse" includes "practices that are inconsistent with sound fiscal or business practices and result in unnecessary cost to the Medicare program, the Medi-Cal program, another state's Medicaid program, or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency."

49.     Medicaid, like Medicare, generally pays providers a flat fee based on the procedures performed and professional services rendered.  However, in some instances, where the cost of a device used in a procedure may be very high, Medicaid will pay on a "pass-through" basis.  This means that the cost of the device, usually an implant, will be carved out of the DRG or APC-based payment and be paid separately.  The provider is usually paid for the device on a "cost-plus" basis, i.e., the cost paid by the provider for the device plus a small percentage.  Other government-funded and private insurers, including those referenced below as well as workers' compensation insurers, similarly pay for certain devices on a pass-through basis.

## VI.     OVERVIEW AND DETAILS OF THE SCHEMES

### A.     Unlawful Kickbacks in Violation of the Anti-Kickback Statute

50.     Defendants perpetrated two interrelated schemes in violation of the AKS:  (1) routine waiver of patient co-pays and deductible in exchange for referrals of Medicare and

Medicaid business; and (2) the "Loss-Leader / Pull Through" kickback scheme provided physicians free lab testing to induce those physicians to refer Medicare and Medicaid business. As detailed below, Defendants violated the FCA by charging Medicare and other government payers for business generated through these two schemes.

### 1)    *Systematic Practice of Waiving Co-Payments and Deductibles*

#### a.    *Defendants Undermine the Medicare, Medicaid, & Private Insurance Safeguards*

51.     Private insurance companies generally require that a patient ordering a laboratory test make a co-payment (a/k/a "copay" or "coinsurance") of approximately 20% of allowable charges to the laboratory.  Typically, private insurance companies also require their patients to make a deductible payment to the laboratory until the patient has met his/her deductible amount for the year, which can range from $2,000 to $5,000.  Managed care companies, such as Blue Cross/Blue Shield, United Healthcare, Aetna, and Cigna administer a variety of health and welfare benefit plans.  As part of their fiduciary responsibilities to those plans, the managed care companies are responsible for controlling healthcare costs.  One of the primary ways that managed care companies control costs is by requiring plan members to pay deductibles and co-payments.  This provides a safeguard against plan members' health care providers ordering excessive testing or tests not medically useful on a patient-by-patient basis.

52.     Commercial reference laboratories perform clinical laboratory services, which entail analyses of human body specimens, including blood, to assist physicians in diagnosing human disease and monitoring treatment.  OPKO / BRLI perform clinical laboratory services for patients covered under the federal Medicare program, state Medicaid programs, and private managed care companies.  Commercial reference laboratories, like OPKO / BRLI, obtain requests for clinical tests from physicians, clinics, and hospitals.

53.     When the laboratories run these tests, they submit claims for reimbursement to the appropriate payer—Medicare, Medicaid, private insurance, client (ordering physicians, hospitals, and clinics), or patients—for reimbursement, identifying the tests performed by a uniform

Current Procedure Technology ("CPT") code.  These claims are typically submitted electronically to government and private payors such as Aetna, Cigna, Blue Cross/Blue Shield, and United Healthcare.

54.     It is well understood in the laboratory industry that routine waiver of patient co-pay and deductible obligations is improper and illegal.  Under Medicare, "Routine waiver of deductibles and co-payments by charge-based providers, practitioners or suppliers is unlawful because it results in . . . false claims . . . [and] excessive utilization of items and services paid for by Medicare."[2]

55.     In *Reynolds v. California Dental Service*, the California Court of Appeals upheld the validity of the ban against waiving copayments, writing: "The ban against waiving the copayment is simply the corollary of the rule that a [health care provider] must report his true fee to [the plan]; if a [health care provider] intends to waive the copayment, it is fraudulent for him to report to the [the plan] that his fee includes the copayment."  200 Cal.App.3d 590, 602 (1988). This conduct is thus not a mere breach of contract between providers and insurers; it is fraud; fraud that leads to unnecessary medical testing, and ultimately, higher premiums for consumers.

56.     In addition to California, other states have made clear the impropriety of waiving co-payments and deductibles.  For example, the Florida Statutes provide, in pertinent part:

> (7)(a)  **It shall constitute a material omission and insurance fraud**, punishable as provided in subsection (11), for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, **if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge**. With respect to a determination as to whether a service provider has engaged in such general business practice, consideration shall be given to evidence of whether the physician or other provider made a good faith attempt to collect such deductible or copayment.

Fla. Stat. § 817.234(7) (emphasis added).

---

[2] HHS OIG Special Fraud Alerts, https://oig.hhs.gov/fruad/docs/alertsandbulletins/121994.html (Dec. 19, 1994).

57.     Defendants undermine the safeguards placed by Medicare and private insurance companies by fraudulently waiving patient copays and deductibles.  As detailed below, Defendants lure patients from health plans administered by managed care companies by misrepresenting those patients' responsibilities under the plans, promising not to collect deductible or co-payments, and promising not to seek reimbursement for any remaining portion of the patients' bills that are uncovered by the plan.

### b.      The Co-Pay Waiver Scheme

58.     Defendants systematically promised physicians that they will never collect copayments or patient deductible payments from their patients.  The underlying fraud began at BRLI and has continued after BRLI was acquired by OPKO on August 20, 2015.  Waiving copayments and deductibles directly violates the AKS.

59.     BRLI is divided into five divisions.  Each division has a Vice President of Sales and they all reported to the Executive Vice President of Sales, Defendant TODD.

60.     Defendant TODD, "built and led the team that has driven the consistent and impressive growth in sales of the company over two decades."  **Exhibit 2.**

61.     Defendant TODD was instrumental in implementing sale strategies and educating sales representatives on the illegal policy of writing-off patient and ordering physician invoices.

62.     BRLI defrauded Medicare and private insurers by routinely waiving patients' copayments and/or deductibles as an incentive for physicians to refer business to BRLI.

63.     Defendant TODD instructed directors, managers, and sales representatives to routinely meet with physicians and encouraged them to order large panels of women's health tests for their patients.  As part of this standard sales and marketing process, Defendant TODD instructed sales representatives to tell physicians that BRLI would not bill its patients for co-pays and deductibles.  Women's Health sales representatives including Brandy Gentry, Savita Devlin, and Mariam Lieberman routinely carry out this directive at facilities such as Health Care for Women in Salinas, California and with Michael Contro, M.D., OBGYN.

64.     As Clinical Sales Manager, Relator-member Mr. Prendergast witnessed this routine practice from at least 2013 to 2018.  Mr. Prendergast was informed by several Oncology and Women's Health sales representatives, including Brittney Smith, Christine O'Rouke, John Weiddig, Kyran Lambert, Thomas Hill, Mike Treloar, Sara Ford, and Chris Ferraro, that they also routinely carried out the above directive.

65.     As part of the company's sales pitch to ordering physicians, BRLI Sales Representatives gave large numbers of the Sales Representatives cards to physicians with the direction to pass them out to their patients with the instruction that if the patients received an invoice, to simply call the provider's sales representative, who will waive any patient co-payment or deductible payments.  Jo Anne Albersten, BRLI's Northern California Sales Representative, informed Relator-member Chris Riedel, CEO of Hunter Labs, in his office in approximately 2014 about this practice, and gave him the business card shown in **Exhibit 3.**

66.     Patient fees for BRLI's GenPath[3] Cervicitis/Vaginitis panel, the most frequently ordered women's health panel, amount to $2,195, which is what patients are obligated to pay if they have not met their deductible (**Exhibit 4**, Women's Health Fee Schedule).  The co-payment would amount to $439.  BRLI/OPKO could never have grown at a rate 400% greater than its largest competitors, and the industry as a whole, without this illegal billing scheme.  It is important to note that BRLI/OPKO has no proprietary testing.  The only unique feature of the company is this "free testing for patients" scheme.

67.     As a direct result of this policy, patient bad debt was more than 300% of patient net revenue for the years 2011 through 2014 for BRLI.  An internal company document for FY 2013 and 2014, titled "Current Sales Analysis," documented that the company collected only 14% of patient billings in 2013 and 11% in 2014.  *See* **Exhibit 5.**

68.     These numbers are far outside industry norms.  Third party insurance companies pay off their own fee schedules, which is why collections are so low for third party insurance

---

[3] GenPath Diagnostics is a division of BRLI.

companies.  Patient billings and provider billings, on the other hand, should result in approximately 95% collections.  For example, according to Laboratory Economics, a leading industry publication, Quest Diagnostics—the largest laboratory testing provider in the United States—had bad debt amounting to only 4.0% in 2015 and 4.1% in 2016.  *See* **Exhibit 6.**

69.   BRLI and its officers and directors knew that the illegal policy of writing-off patient and client receivables drove this "bad debt."

70.   This policy was set up and monitored on a weekly basis by BRLI's CEO, Defendant GRODMAN, and CFO, Nicholas Papazicos.

71.   OPKO's Assistant Vice President for Internal Audit, Relator-member Neville Brooks discovered during routine audits between 2009–2015 that as much as 75% of women's health invoices for deductible and copayments were never sent to patients.  Mr. Brooks' audits further confirmed that patients were never sent to collections for unpaid copayments and/or deductibles, and that patients with certain out-of-network insurances were not billed at all.

72.   Mr. Brooks set up BRLI's internal audit department and processes immediately after he began working at BRLI, which he completed by early-2008.  He subsequently conducted internal audits every quarter, which typically involved reviewing a sample compilation of 25 requisitions (documents stating tests ordered by doctors, patient identities, etc.) and having discussions with the corresponding salespeople.  Mr. Brooks' first such audit, for the first quarter of 2008, revealed that BRLI was routinely refraining from billing and collecting patient copayments and/or deductibles.

73.   Upon completion of his first quarterly audit, Mr. Brooks immediately reported the copayment/deductible issue to BRLI's CFO, Sam Singer, but was simply told, "Don't worry about it."  Mr. Brooks' subsequent audits confirmed that the businesses' improper practice of effectively waiving patient copayments and/or deductibles continued thereafter.  Mr. Brooks raised the issue to Mr. Singer at least twice a year, after quarterly audits, but was always given the same response to simply disregard or ignore the issue.

74.     Mr. Brooks also raised his concerns to the Vice President for Billing, Sally Howlett, Assistant Vice President for Billing Steve Washburn, Director of Billing Bob Berkenbush, and Billing Manager Sean English, as well as Mr. Singer, during annual meetings to discuss Mr. Brooks' audit findings.  Mr. Brooks was told by Mr. Singer that because under GAAP this was not a "material weakness" it need not be reported to the Audit Committee of the BOD.  Mr. Brooks told Singer that he believed this was an "illegal practice."  Singer replied: "OK, go away."  Mr. Brooks knew that if he did not do as instructed by Mr. Singer, he would be fired, so he took no further action.

75.     On two occasions during OPKO's due diligence to purchase BRLI, Mr. Brooks informed OPKO's Senior Vice President and Chief Financial Officer, Defendant Adam LOGAL, of these illegal practices that were transpiring at BRLI.  Indeed, Mr. LOGAL had requested these meetings because he heard about illegal activities potentially occurring within BRLI and was thus uncomfortable with the financial metrics that had been provided to him during the course of OPKO's due diligence.

76.     The first meeting took place in June of 2015, at a restaurant in New York City, where Mr. Brooks, Mr. LOGAL, and Igor Gitelman, BRLI's Assistant VP of Finance, met to discuss Mr. Brooks' concerns about illegal activities at BRLI.  Specifically:

- not billing patient's co-payment and deductibles;
- agreeing not to require certain physicians to make any payments on their client invoices;
- adding improper diagnosis codes not provided by the physician for the purpose of triggering payment; and
- adding tests not ordered on requisitions without any documentation of physician authorization.

77.     Mr. Brooks emphasized that as a result of the above-described practices, BRLI's financials may not accurately reflect BRLI's operations and financial condition.

78.     Mr. LOGAL took notes and responded: "OK, this is good information."

79.     The second meeting took place in early August 2015.  At the invitation of Mr. LOGAL, Mr. Brooks and Mr. Gitelman flew to Miami and met at a restaurant with Mr. LOGAL. Mr. Brooks and Mr. Gitelman again laid out the illegal activities at BRLI.  Shaking his head, Mr. LOGAL simply stated: "OK, I am taking notes," but made no commitment to stop these schemes.

80.     Notwithstanding, on August 20, 2015, OPKO announced the completion of the acquisition of BRLI.  Defendant OPKO continues to perpetrate the same fraudulent schemes that BRLI has carried out for years.

81.     Notably, OPKO strongly considered restating BRLI's financials almost immediately after the acquisition was complete, due to the inaccuracies resulting from improper billing practices.

82.     In or around Fall 2015, OPKO brought in an outside consulting firm, Sunera, to conduct an audit and calculate by how much the financials would need to be restated.  After determining that BRLI's financials were inaccurate, Sunera worked with personnel at OPKO (and BRLI) to draft a Staff Accounting Bulletin (the "SAB Memo") detailing the prospective restatement of BRLI's financials.  A draft of the SAB Memo was circulated by Sunera on October 21, 2015, in an email to personnel at OPKO (and BRLI), including Mr. LOGAL and Mr. Papazicos.  During the course of revisions over the next week or so, BRLI's Assistant Vice President of Finance, Igor Gitelman, was included on the email chain.  Mr. Gitelman ultimately forwarded the email chain and attached SAB Memo to Mr. Brooks in July 2016.  The email chain and attached SAB Memo are attached hereto as **Exhibits 7 and 8**.

83.     Although the contemplated restatement of financials never occurred, and the SAB Memo was never posted or circulated more broadly than the small group of OPKO/BRLI personnel who worked with Sunera on the issue, the SAB Memo is telling in its conclusions.  For example, the third paragraph of the SAB Memo states (Ex. 8 at 1):

>       In October 2015, when preparing the opening balance sheet for BRLI which
>       required the review and analysis of all critical balance sheet accounts of

BRLI including review of its historical financial statements, OPKO management formed a preliminary conclusion there was a misstatement in BRLI's historical financial statements, as filed with the SEC, regarding an understatement in the estimated contractual allowances resulting in an overstatement of net accounts receivable for fiscal 2012 through 2014. Additionally, the previous approach resulted in an overstatement of net sales in fiscal 2013 and 2014 and an understatement of net sales in fiscal 2012 and misstatements of net income in 2012 through 2014. This also impacted BRLI's historical quarterly financial statements, as filed with the SEC, throughout fiscal 2012 and 2015 (through Q2 of fiscal 2015) in a similar manner. Further, BRLI believes that this error has resulted in a cumulative adjustment for years 2011 and prior resulting in a cumulative overstatement in accounts receivable and net income.

The deficiencies in BRLI's accounts receivable—including the practice of effectively waiving patient copayments and/or deductibles—are likewise discussed in the SAB Memo. *See, e.g.*, Ex. 8 at 2.

84.     Despite the findings described in the SAB Memo, and the serious consideration OPKO gave to restating the financials due to the inaccuracies described in the SAB Memo, OPKO ultimately decided not to make such a restatement and never publicly disclosed the findings outlined in the SAB Memo.

85.     Mr. Brooks' post-acquisition quarterly audits confirmed that the schemes continued after OPKO acquired BRLI in August 2015.

86.     One year later, in October 2016, while the schemes continued, Mr. Brooks and Mr. Gitelman were both terminated.

87.     In October 2016, OPKO hired a new Chief Legal and Compliance Officer, Jane Pine Wood. Ms. Wood drafted Compliance Policies to discontinue some, but not all, fraudulent activities, in 2017. One of the activities that Ms. Wood attempted to discontinue was the waiver of co-payments and deductibles.

88.     However, without the waivers, kickback and illegal billing schemes gross revenues missed internal projections by $100 million in the quarter ending June 30, 2017 (OPKO 10-Q filed August 8, 2017), resulting in a pre-tax loss of $28.5 (excluding an income tax credit).

89.     In an attempt to recover the substantial lost revenue due to elimination of the policy of not billing patients and physicians, OPKO initiated a new variation of its co-pay and deductible waiver scheme.

90.     Specifically, OPKO would send three bills to patients over a span of 90 days.  The sales representatives were instructed to inform physicians that although bills were being sent out, patients did not have to pay the bill and OPKO would not send the bill to collections.  After the 90 days, the sham bills would be written off and no further action would be taken.

91.     In fact, in contrast with standard industry practices, OPKO did not even employ a collection agency.

92.     In or around May of 2017, Women's Health Sales Managers Todd Brown, Jack Smith, and Todd McKinley, corroborated this practice and expressed their frustration to Mr. Prendergast regarding the obstacles created by the new scheme.  For example, in May of 2017, after a quarterly meeting at a Marriot Hotel in New Jersey, Todd Brown informed Mr. Prendergast of the new three invoice scheme and the negative impact it would have on his clients.  At the same Marriot Hotel, Jack Smith also informed Mr. Prendergast of the scheme. On September 28, 2017, Mr. McKinley also relayed concerns regarding the fraud scheme at Larios, a restaurant in Miami, Florida.

93.     On August 9, 2017, BRLI's new Senior Vice President of Sales, Vicki Laughman, convened a mandatory conference call with seventeen Regional Managers—including Relator-member Richard Prendergast—and six Directors of Sales to announce the $100 million shortfall. Attendees of the mandatory conference included the following individuals:

- **Directors of Sales**
  - Anthony Hu
  - Jack George

- **Clinical Regional Managers**
  - Richard Prendergast
  - Dianne McCallister
  - Jacqueline Rodriguez
  - Jean Gray

- o Joe Connor
- o Marina Agilina
- o Michael Spatafora
- o Miguel Sanchez
- o Scott Fein
- o Silvia Arana-Gil

- **GenPath Directors of Sales**
  - o Erica Daulton
  - o Joseph Abbamont
  - o Darrell Fassberg

- **GenPath Regional Managers**
  - o Brian Macioce
  - o Doug Stone
  - o James Rucks
  - o Jeff Osboe
  - o Jennifer Dodd
  - o Ken Sullender
  - o Matthew Meegan

94.     During the call, Ms. Laughman declared that "**patients will still not be required to pay invoices,**" but they will receive three before the invoice would be automatically written-off, no matter the amount.  This new billing policy was met with significant pushback from the sales team.  Several Regional Managers complained that this will hurt sales and "we will be at risk of losing business."

95.     The GenPath Regional Directors in particular, such as Jeff Osboe and James Rucks, were very vocal about the impact that sending bills to patients—even sham invoices with no intent to actually collect—would have on their book of business.  In response, Ms. Laughman instructed the attendees to notify their physicians clients that "their patients would receive invoices and that they should just throw them away and that patients would never be sent to collection."

96.     The following day, Ms. Laughman sent a follow up email to OPKO employees, including Mr. Prendergast, to address issues discussed at the August 9 meeting.  Ms. Laughman detailed the need for a full audit "getting to the bottom" of sale representatives concerns regarding the new billing process.  Ms. Laughman also confirmed the ongoing extent of

uncollected patient bills, stating that "approximately $3,000,000 per month or $36,000,000 annually that goes unpaid and ends up in bad debt." **Exhibit 9.**

97.     Again, these bills are not for insignificant amounts.  For example, under the new variation of the scheme, if a patient receives an invoice of $2,195 for OPKO's Cervicitis/Vaginitis panel, the patient can just ignore the three invoices without any worry about the invoice being sent to collection.  (And again, prior to OPKO's acquisition of BRLI, patients would never receive an invoice at all).

98.     On October 1, 2017, BRLI sent a document to all Regional Managers—including Relator-member Richard Prendergast—entitled "Patient Billing Policies: Executive Summary" with the highlighted notation: "DO NOT DISTRIBUTE."  **Exhibit 10.**

99.     This October 1, 2017 Patient Billing Policies document confirmed that patients are never sent to collection and patients with certain out of network insurances are not billed. *See* **Exhibit 10.**



- ▪ **What has changed**
  - ✓ If Effective 11/01/17, patients are receiving two (2) statements followed by a pre-collect letter.
    - ○ The first statement is sent once a balance becomes the patient's responsibility (Day 1)
    - ○ The second statement is sent 30 days thereafter (Day 30)
    - ○ The pre-collection notice will be sent 30 days after that (Day 60)
  - ✓ Self-pay patients who pay their bill and then choose to submit active insurance information will be refunded only after the insurance carrier adjudicates and pays the claim.
- ▪ **What has stayed the same/Coming Soon**
  - ✓ Patients with a *self-pay balance after insurance* are not sent to collections. It is our hope and expectation that the pre-collect letter incentivizes patients to pay appropriately.

100.     Although OPKO had no intent to actually collect from patients, due to the new policy of sending two or three sham invoices, many physicians and health care facilities stopped using OPKO.  For example, in late 2017, Mr. Prendergast was asked to visit Tahema Women's Medical Group because of several complaints regarding the three-invoice policy.  At that time,

the prior sales manager and sales representative responsible for Tahema had left, and Jack Smith, Senior Director of Sales, instructed Mr. Prendergast to inform the office manager to have their patients ignore the bills, that they will never be sent to collections, and that the bills will be written off.  Prior to this new billing system, Tahema Women's Medical Group's patients did not receive bills at all for co-pays or deductibles.  Despite the personal visit, OPKO eventually lost Tahema Women's Medical Group's business.

101.    OPKO utilizes the same billing scheme for its pharmaceutical drugs.  Rayaldee has been described in OPKO's 10-Ks as the "feature" of their pharmaceutical segment.  The drug is an FDA-approved treatment for secondary hyperparathyroidism in adults with stage 3 or 4 Chronic Kidney Disease and vitamin D insufficiency.  It was approved in June 2016 and launched later that year in November.

102.    The price for Rayaldee is $2,800 per month.  Utilizing the same tactic BRLI used for lab testing, patients are instructed to call OPKO if they receive a deductible or co-pay invoice.

103.    On September 15, 2017, OPKO Connect told Relator-member Riedel over the phone that typically Rayaldee it is zero-dollar deductible or co-pay, but it can be as high as $25.  Medicare is paying $33,600 per year for Rayaldee, whereas patients typically pay zero.

104.    BRLI knew that the scheme to routinely not bill co-pay and deductible charges to patients and writing off patient balances had successfully been prosecuted by DOJ.  For example, Jane Pine Wood, the Chief Legal and Compliance Officer of BRLI, has described those prosecutions in a handout provided to the Sales Representatives and Regional Managers, including Relator-member Richard Prendergast, regarding Compliance Risks for Laboratories.  It was dated 2017 and stated that Quest Diagnostics/Berkeley Heart Lab paid $6 million to settle kickback claims.  Specifically alleged by the government in that case was that the "laboratory provided kickbacks to patients in the form of **routinely waiving copayments and other patient balances**." (Emphasis added).  **Exhibit 11.**  Ms. Pine Wood also publicly stated in a laboratory industry trade publication, the "Dark Report," that "A co-pay, deductible, or out-of-pocket

charge required of the patient that is waived by the laboratory is remuneration covered by the fraud alert (December 1994)."

105.    On Friday August 24, 2018, Relator-member Prendergast attended a "town hall" presentation at BRLI's Campbell laboratory to hear a state of the company presentation by Geoff Monk, the company's new general manager.  There were approximately 20 employees in the room.  Mr. Monk stated: "we have made several changes, including cleaning up the operational and billing mess."  He went on to say that BRLI had been growing 20% year over year, but the collection rate was a "mess" with not collecting and write-offs.  Mr. Monk told everyone in the room that: "BioReference was engaged in illegal billing practices."  After the meeting, the California Laboratory Manager, Terri Schroeder, expressed her shock to Relator-member Prendergast that the GM was admitting illegal activity to a room full of employees.

106.    Jan Brooks, a BRLI sales representative, also corroborated illegal billing practices.  In March of 2016, Ms. Brooks disclosed to Relator-member Prendergast "that illegal billing was occurring in the New Jersey BRLI headquarters."  Ms. Brooks learned this information from Michelle Farleigh, who served as the California Billing Manager until billing was moved to BRLI's corporate office in New Jersey in 2014.  Ms. Brooks also told Relator-member Prendergast that their commission reports were inaccurate because of the illegal billing.

107.    Further evidence of this scheme comes from Bill Wesnofske, a former BRLI Senior Director of Sales, Northern Region.  Relator-member Riedel learned that in May 2018 Mr. Wesnofske was hired by another clinical laboratory, ENZO, as National Head of Strategic Markets.  At that time, Bruce Dey, ENZO VP Marketing and Sales, was in meetings with ENZO's CEO, Eleazar Rabbani, Kara Cannon, Chief Commercial Officer, and Patricia Eckert, CFO (Acting), where Mr. Wesnofske shared BRLI revenue reports that demonstrated how much "profitable pull through" (Wesnofske's description) BRLI captured from out-of-network insurance plans that BRLI secured with the scheme, including Emblem GHI and Horizon Blue Cross Blue Shield of New Jersey.  Mr. Wesnofske passionately encouraged ENZO to adopt BRLI's out of network "profitable pull through" scheme where patients were never sent invoices

for deductible, co-payments or co-insurance for out of network plans.  An additional benefit, according to Mr. Wesnofske, was that out-of-network labs were paid much higher rates than in-network labs.

108.    Every quarter, Defendant FROST speaks with the investment community after OPKO's earnings are released about the company's progress.  Defendant FROST specifically detailed OPKO's investment into BRLI to permit better collection of receivables.  As part of his responsibilities as Chairman and CEO, Defendant FROST was aware of the fraudulent activity at OPKO when reporting to the investment community. **Exhibit 12.**

109.    Through OPKO / BRLI's illegal billing practices and by misleading plan members that they are not responsible for any deductible or co-payments, BRLI increases the volume of its business while simultaneously increasing the damage to the managed care companies and the plans they serve.

110.    One of the principal purposes behind copayment and deductible requirements is to make patients conscious of the expense of their medical services, and thereby discourage the ordering and performance of unnecessary medical services.  Copayments and deductibles act as embedded internal controls for payors.  There is no better mechanism to ensure that unnecessary tests are not ordered than requiring patients to pay a portion of the invoices for laboratory tests.  Although copayments and deductibles can be a financial burden to patients, especially to those for whom physicians order expensive women's health panels and cancer tests, service providers are required to make all necessary efforts to collect co-payments from patients, with limited exceptions.

111.    As a condition of receiving payment from Medicare and Medicaid, OPKO and BRLI certified, both implicitly and explicitly, their compliance with relevant federal and state statutes and regulations.  Rather than abide by these statutes and regulations, Defendants defrauded these programs by inducing physicians to order tests by offering kickbacks, and submitted claims for medically unnecessary tests.

112.    Waiving co-payments and deductibles is of great benefit to the doctors, who are able to attract and retain patients' business by promising free lab testing.  Physicians market free testing to their patients to make their offices more appealing, thereby improving the physicians' overall revenues and ratings.

113.    Defendants' pattern and practice is clear:  physicians can order any test they want—even medically unnecessary tests—because the costs are picked up by Medicare, Medicaid, other government programs, and insurance companies.  Although BRLI and OPKO lost money on uncollected co-payments and deductibles, it more than made up the difference with the profits it earned on the other referral business, such as Medicare, Medicaid, and private insurance.

114.    The waiver of deductibles and co-payments constitutes illegal remuneration, designed by Defendants to "pull-through" higher-paying Medicare and Medicaid business to Defendants.  Defendants tell physicians that there is no reason not to order these large panels because their patients will never have to pay anything.  Furthermore, waiving insurance deductibles and co-payments is explicitly illegal under the laws of several states, including Florida and California, where OPKO has substantial business.  These large panels are among the most expensive test panels ever designed.

115.    Additional examples of BRLI / OPKO providers receiving written-off of client or patient invoices (waived co-payments and deductibles) are listed in **Exhibit 13.**

### *2)    Defendants' "Loss-Leader / Pull Through" Kickback Scheme*

116.    The second scheme to improperly provide 'kickbacks' to physicians is even more direct than waiving patient copayments and deductibles:  through the "Loss-Leader / Pull Through" kickback scheme, OPKO / BRLI provided physicians free lab testing to induce those physicians to refer Medicare and Medicaid business to them.

117.    Under the AKS, a company commits fraud when it offers doctors and other healthcare providers financial incentives to use the company's products or services, for which payment may be made under Medicare, Medicaid or other federally funded healthcare programs.

118.    The "Loss-Leader/ Pull Through" scheme is quite simple.  The scheme is founded on the fact that physicians generally do not want to use multiple laboratories depending on the payor because it creates more work for their offices.  OPKO / BRLI "hook" physicians by offering free testing for patients whose tests are billed through the physician (referred to in the industry as the "client bill" segment).  While labs lose money on the free testing, the labs generate tremendous revenue growth and profit from the "Pull Through" Medicare, Medicaid, and private insurance business that is not billed through the physician, but billed directly by the laboratory.  These three payors make up approximately 84% of the OPKO / BRLI's revenue.

**Exhibit 1.**

119.    For at least 9 years, beginning in at least 2008, just after Mr. Brooks was hired in November 2007, BRLI followed a policy of intentionally agreeing not to require certain physicians to make any payments on their client invoices.  Defendants promise certain doctors they will either never receive invoices for client billed services, or the invoices will be written off.  In either case, the testing is free to ordering physicians.  This scheme provided direct financial gain to physicians, who bill managed care or patients for the free testing.

120.    Not collecting physician invoices creates a financial windfall for the Company because it ultimately gained the "pull-through" revenue from third party payors on laboratory tests.  Writing-off invoices to ordering physicians is akin to handing them envelopes of cash in exchange for Medicare, Medicaid, and insurance referrals.[4]

121.    By way of example, **Exhibit 13** lists of over 100 physicians whose patients received free lab testing.  Relator-member Richard Prendergast was able to generate the

_____

[4] Relator-member Prendergast also received many complaints from GenPath Regional Managers and his own sales representatives that their commissions were taking a big hit because BRLI did not have a Medi-Cal license.  Nonetheless, BRLI accepted and tested Medi-Cal specimens, but did not bill anyone for the tests.  This is another version of the "Loss Leader/ Pull Through" scheme.  Rather than not be able to compete for new clients with a significant Medi-Cal patient population, and to retain clients from the Hunter Labs acquisition, BRLI tested all Medi-Cal specimens for free from August 14, 2016, until BRLI received a Medi-Cal license in approximately August 2018.

information directly from the BRLI database.

122.     Beginning in April 2008, Mr. Brooks reported the out-of-bounds level of client bill write-offs on a regular basis to his boss, the CFO Sam Singer.  Each time, Mr. Brooks advised Mr. Singer that this was illegal.  Mr. Singer cavalierly told Brooks, "Don't worry about it" whenever Mr. Brooks brought it up, which Mr. Brooks did at least twice per year over the course of his employment.

123.     Based on Mr. Brooks' research, many of the physicians receiving free testing were located in New York's Chinatown, and were being serviced by Dr. Anthony Hu.  They are identified on **Exhibit 14.**

124.     Bruce Dey, a laboratory-industry insider, further confirmed this scheme with Relator-member Chris Riedel.  For years, certain ENZO sales representatives found it impossible to even try to covert BRL accounts in areas like Chinatown to ENZO, unless ENZO also provided free testing, deep discounts for cash pricing (self-pay), to ordering physicians and agree to no balance billing to patients.

125.     Defendants violated the FCA by charging Medicare for lab tests that were referred to Defendants by providers because of kickbacks offered to those providers by Defendants.

126.     At all times relevant hereto, Defendants knew that federal law prohibited their giving or receiving these kickbacks.  Defendants certified, both explicitly and implicitly, that each claim they submitted to Medicare would fully comply with all statutes and regulations, including the anti-kickback provisions, and that as Medicare providers, they would comply with all pertinent statutes and regulations, including the anti-kickback provisions.

127.     Each claim for payment that Defendants submitted to Medicare, and to the state Medicaid programs from at least 2007 to the present, which was referred to Defendants by a provider who received from Defendants the remuneration described above constitutes a false claim in violation of the False Claims Act (31 U.S.C. § 3729 et seq.).

128.     Over this time period, Defendants have submitted tens of millions of such claims for payments, and received hundreds of millions of dollars from the Government as a result of these illegal kickbacks.

**B.     Defendants' Unauthorized and Fraudulent Coding Schemes**

129.     Defendants' schemes also included adding unauthorized and inappropriate diagnosis codes to trigger payment.

### *1)     Overview of Code Steering Scheme*

130.     ICD-9/ICD-10 codes (International Classification of Disease, 9th and 10th Edition, Clinical Modification) are used for the classification of disease and conditions and for describing signs, symptoms, and medical circumstances.  These codes are used to indicate the medical necessity of a particular test.  Without appropriate diagnosis codes, CPT codes will not be paid.  ICD-9/ICD-10 codes can only be supplied by the ordering physician or a representative of that physician.  "Code steering" refers to the illegal act of steering or directing a physician to supply an ICD-9/ICD-10 code that is payable.

131.     The OIG's compliance guidelines for clinical laboratories, published in August of 1998, clearly explain that "code steering" violates Medicare statutes and regulations:

> Laboratories should not: (1) use information provided by the physician or other authorized individual from *earlier dates* of service (other than standing orders, as discussed below at paragraph 4); (2) create diagnosis information that has triggered reimbursement in the *past*; (3) use computer programs that automatically insert diagnosis codes without receipt of diagnostic information from the ordering physician or other authorized individual; or (4) **make up information for claim submission purposes.** Laboratories should: (1) contact the ordering physician, authorized person on the physician's staff or other individual authorized to order tests to obtain information in the event that such information was not provided; and (2) accurately translate narrative diagnoses obtained from the physician or other authorized individual to ICD-9-CM codes.

OIG Compliance Program Guidance for Clinical Laboratories, 1998

132.     Defendants have engaged in acts of "code steering" by adding diagnosis codes to invoices that were not provided by the ordering physician or representative.  It is against the law

to use ICD-9/ICD-10 codes for the purpose of causing or increasing payment for a test.

133.    Beginning with the 2009 Annual Audit, Mr. Brooks compared the requisition diagnosis codes provided by the ordering physician to the codes that were billed for a random sample of 25 patient orders.  Mr. Brooks discovered that many diagnosis codes provided by ordering physicians were being changed by BRLI prior to billing.  Mr. Brooks first brought this scheme to the attention of the Billing Manager, Sean English.  Mr. English told Mr. Brooks that the billing representatives recognized that diagnosis codes provided by the ordering physician would not trigger reimbursement, so they changed the diagnosis codes so that they would be reimbursed.  Mr. Brooks replied, "you know that this is illegal?"  Mr. English told Mr. Brooks to "go talk with his boss," Sally Howlett, Vice President of Billing.  Mr. English also stated that "Sally knows that there are no safeguards in place to prevent the billing representatives from entering false diagnosis codes."

134.    When Mr. Brooks raised the code-changing issue and concerning lack of controls, Ms. Howlett responded, "What do you want me to do about it?"  Ms. Howlett did not thereafter take any action to address the problem.  Mr. Brooks concluded that the company was not performing any routine audits that would have caught this scheme.  He continued to raise the issue with Ms. Howlett and Mr. English at least once per year, after Mr. Brooks completed each Annual Audit, but the issue went unremedied.

135.    Moreover, in June 2009, Mr. Brooks discussed the issue with Billing Manager Teresa Caraccio, who informed Mr. Brooks that Ms. Howlett had instructed billing managers to use diagnosis code 72.60 for commercial billing that had no diagnosis code provided on requisitions, thus automatically triggering improper reimbursements.

136.    Ms. Caraccio later informed Mr. Brooks that in 2015 Ms. Howlett instructed billing managers to use ICD 10-200.00, which also triggers improper reimbursements. Ms. Caraccio further explained that a certain procedure—a TC/PC bone marrow split—was routinely billed for both pathology and clinical components, whereas the clinical component should not have been billed at all. Billing both the pathology and clinical components resulted in greater

reimbursements.

137.    Additionally, Mr. Brooks' audits of women's health panels revealed that from 2009–2016, BRLI's Candida test panel was billed by providers as a single-unit test, but BLRI routinely added an additional six units in its billing claims, thus resulting in greater—and improper—reimbursement amounts.

138.    Medicare regulations require notifying CMS within 60 days and repayment for the false claims related to the unauthorized diagnosis codes.  As the internal auditor, Mr. Brooks saw that no repayments of any kind were made to CMS based on the fraud he uncovered.

139.    In addition to failing to notify CMS and repay the false claims, Defendants did not put in place a routine auditing system to document that only the diagnosis codes provided by physicians were billed, as required by the 1967 Clinical Laboratory Improvement Act ("CLIA").

### 2)    *Overview of Upcoding Scheme*

140.    CPT codes are assigned for each test and or test methodology.  Billing an inappropriate CPT code for the test performed is referred to as upcoding.  Upcoding is done for the purpose of increasing reimbursement beyond the appropriate fee for a test or test methodology.

141.    Defendants routinely up-coded inappropriate CPT codes to trigger increased payment.

142.    During the course of Mr. Brooks' discussions about the issues with improper code revisions described above, BRLI Billing Manager Sean English gave approximately 50 up-coded requisitions to Mr. Brooks, and mentioned that at least two specific managers, Susan Vogel and Minal Patel, had been entering false billing codes.  Mr. English told Mr. Brooks that shortly after the upcoding came to light, Howard Dubinett, BRLI's Executive Vice President, went into the billing department and took Mr. English's only remaining copies of these up-coded invoices, which were presumably then destroyed.

143.    Every year after performing the internal audit, Mr. Brooks notified Sean English, Sally Howlett and Mr. Brooks' boss, Sam Singer, that illegal upcoding was occurring.  Mr.

Brooks in his role as Internal Auditor checked to see if any payments had been made to CMS. He could find no repayments.

      C.    **Defendants Violated the False Claims Act by Billing for Medically Unnecessary Laboratory Tests**

     144.    Defendants systematically bill Medicare and Medicaid for medically unnecessary tests.  Specifically, Defendants' women's health panels include tests that are pre-selected by Defendants.

     145.    Defendants induced doctors to order panels comprised of tests that were not medically reasonable or necessary.

     146.    Test requisition forms encourage physicians to order bundles, or "panels," of pre-selected tests, not all of which are necessary for each patient and were redundant tests. OPKO sales representatives also encourage doctors not to de-select any of the tests.  By running the women's health and ACT panels, Defendants were running duplicative and medically unnecessary tests.

     147.    As just one of many examples of unnecessary, duplicative tests, BRLI/ OPKO's Advanced Cardiovascular testing panel (ACT panel) includes both the Apo-B and LDL-P tests. Both of these tests measure total LDL particles.  There is no medical benefit to including both of these tests because they provide the same medical information and treatment would not be affected by including both tests.  Both tests are pre-selected by Defendants as part of their ACT panel; doctors do not have the option to de-select one of the tests.  Defendants then perform, and bill Medicare for, each of the tests.  Defendants charge Medicare in excess of $19.95 for the Apo-B test, and $42.93 for the LDL-P test.  Each time they do so, Defendants violate the False Claims Act.  Attached as **Exhibit 15** is a copy of the ACT report form showing the duplicative tests.

     148.    Because OPKO does not require patients to pay for co-pays or deductibles, the physicians have no incentive to de-select any of the tests.  Because there is no cost to their patients, OPKO's physician clients order OPKO's women's health panels indiscriminately for

many of their female patients.  Knowing this, OPKO has designed its test panels to maximize their reimbursement from Medicare.  Defendants then perform and bill Medicare for each of the tests.

149.     Defendants violated the False Claims Act by submitting claims for payment for laboratory testing services that Defendants knew were not medically necessary.  Section 1862 of the Social Security Act provides, in pertinent part: "Notwithstanding any other provision of this title, no payment may be made under [Medicare] for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. 1395y(a)(1)(A).

150.     Defendants violated 42 U.S.C. 1395y(a)(1)(A) by ordering medically unnecessary laboratory tests.  Defendants' practice of pre-selecting tests and depriving doctors of the option to de-select a test violates established Medicare regulations as all diagnostic tests "must be ordered by the physician who furnishes a consultation or treats a beneficiary for a specific medical problem . . . ," 42 C.F.R. § 410.32(a), and "tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

151.     As of October 5, 2015, Medicare guidelines state that cardiovascular risk assessment panels performed on patients with pre-existing risk factors for cardiovascular diseases are not medically reasonable or necessary and, therefore, not covered by Medicare.  Specifically, Palmetto GBA Medicare policy (attached hereto as **Exhibit 16**) states, *inter alia*, the following:

> CV risk assessment panels, consisting of various combinations of biochemical, immunologic, hematologic, and molecular tests, is considered screening when performed on an asymptomatic patient, and, as such, are not a Medicare benefit. **These CV risk assessment panels are not medically reasonable and necessary if performed on a patient with existing risk factors including but not limited to pre-diabetes or diabetes, smoking, hypertension or hyperlipidemia because these panels are not specific to a patient's lipid abnormality or disease**.

Palmetto Medicare Policy Guidelines.

152.    Medicare and other federal health care programs require as a condition of coverage that services rendered must be reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1)(A).  Defendants presented to Medicare claims for reimbursement of laboratory tests which were neither reasonable nor necessary.  As such, each of these claims constitutes a false claim in violation of the False Claims Act (31 U.S.C. § 3729 et seq.).  Defendants certified, both explicitly and implicitly, that each claim they submitted to Medicare would fully comply with all statutes and regulations, and that as Medicare providers they would comply with all pertinent statutes and regulations.

153.    Despite these clear Medicare guidelines, OPKO continues to encourage doctors to order their pre-selected ACT panel tests.

**D.**    **Defendants Failed to Pass Along the Lowest Charge to Medicaid Programs in Favor of Private Physicians and Health Plans**

154.    The states of Georgia and Massachusetts require that a laboratories lowest charge to any payor be passed on to the state Medicaid programs.

**1)**    ***Governing Authority***

155.    Title XIX of the Social Security Act and Title 42 of the Code of Federal Regulations authorize individual states to develop and manage their own Medicaid programs. Medicaid is a joint federal-state program that provides health care benefits, including laboratory services coverage, for certain groups including the poor and disabled.  The funding for Medicaid is shared between the federal and state governments.  Each state is required to implement a state plan containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures.  42 U.S.C. § 1396a.  The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  *Id*.  The federal portion of each state's Medicaid payments, known as the Federal Medicaid Assistance Percentage, is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d (b).

35

156.    **Georgia:**  The Georgia Department of Community Health, Division of Medical Assistance ("Division") is solely responsible for the administration, including reimbursement to providers, of Georgia's Medicaid program.  According to the Division's guidance, providers are required to bill the Division "their usual and customary fees," which was defined as "the lowest rate charged to private patients, other third party payers and insurance carriers, health maintenance organizations or other members of the general public for comparable services . . . includ[ing] any special price or discounts offered to such patients."  Schedule of Maximum Allowable Payments for Clinical Laboratory and Anatomical Pathology Services (given force of law by OCGA § 49-4-142).

157.    The lowest rate limitation is also found in the Georgia Medicaid fee schedule "preamble" and in both the Georgia Medicaid Provider Manual ('Provider Manual'), and a similar manual specifically directed at laboratories (the Policies and Procedures for Independent Lab Services Program, or the 'Laboratory Provider Manual').  Indeed, the Georgia Medicaid fee schedule states:

> As required by Divisional policy, providers must bill the Division their usual and customary fees. "Usual and customary" means the lowest rate charged to private patients, other third party payers and insurance carriers, health maintenance organizations or other members of the general public for comparable services. The lowest rate includes any special price or discounts offered to such patients. Providers must not change their fees to the upper limits in this schedule, even if these fees are higher than the maximum allowable payments for the services rendered.

Schedule of Maximum Allowable Payments for Clinical Laboratory and Anatomical Pathology Services (emphasis added).

158.    Both the Georgia Medicaid fee schedule and the Medicaid manual make expressly clear that the lowest charge rule is a condition of payment.  Even more clearly, the Medicaid Provider Manual states, on its very first page:  "This manual contains basic information concerning Georgia's Medicaid/PeachCare for Kids program and is intended for use by all participating providers. Along with the Statement of Participation, this manual encompasses the

terms and conditions *for receipt of reimbursement*." *See* **Exhibit 17** (Provider Manual), at 1 (emphasis added).

159.   Charges in excess of the maximum allowable fees are subject to recovery under both OCGA § 49-4-146.1, and the Georgia False Medicaid Claims Act, OGCA § 49-4-168 *et seq*.

160.   **Massachusetts:**  Massachusetts's Medicaid program, known as "MassHealth," is administered in part by the Commonwealth's Department of Health Care Finance and Policy ("DHCFP").  MassHealth's reimbursement procedures are governed, in part, by Massachusetts's Public Welfare statutes.  Specifically, General Laws chapter 118E, section 41 prohibits providers from offering "any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind to induce" the purchase of services for which MassHealth pays.

161.   The Code of Massachusetts Regulations also requires providers to bill MassHealth lowest of either the provider's "usual and customary charge," the allowable fees listed in 114.3 CMR 20.05, or the rate recognized under 42 U.S.C. §§ 1395 1(h) for such tests. 1143. Code Mass. Regs. § 20.04(1).  The Regulations define "usual and customary charge" as "[t]he lowest fee charged by an independent clinical laboratory for any laboratory service." 1143. Code Mass. Regs. § 20.05.

162.   Charges in excess of the maximum allowable fees are subject to recovery under both the Medicaid provider statute, General Laws chapter 118E, § 38, and the Massachusetts False Claim Act, G.L. c. 12, §§ 5A-5O.

### 2)      *BRLI / OPKO's Medicaid Violations*

163.   BRLI / OPKO was required to bill Georgia and Massachusetts Medicaid at its lowest price and failed to do so.

164.   Defendants GRODMAN and TODD were made aware of this requirement by Relator-member Riedel in May 2012 at the annual War College meeting in New Orleans, attended by over 700 laboratory executives.  GRODMAN had given a speech requesting that labs must do something to stop predatory practices of the two industry giants: Quest Diagnostics

and Laboratory Corporation of America (LabCorp).  After the speech, Mr. Riedel met with GRODMAN and TODD, and discussed his success in California and several other states in suing to stop this taxpayer rip-off of states with lowest charge laws for their Medicaid programs.

165.    In fact, the entire industry was aware of the lowest charge requirements in these states after Quest and LabCorp entered into Settlements in California for almost $300 million in 2011.  Industry publications and the general press widely reported this settlement based on failure to pass on lowest charge, and that similar lawsuits were pending in other states.

166.    As shown on the chart below, the published women's health panel client fees to ordering physicians were required to be billed to these state Medicaid programs.  Rather than comply with state laws, BRLI and OPKO billed Georgia and Massachusetts Medicaid programs its highest fees, the patient fees.

| Cervicitis/ Vaginitis Panel | CPT | Patient Fee | Discounted Client Fee | State Medicaid Fees | |
|---|---|---|---|---|---|
| | | | | MA | GA |
| PAP | 88175 | $95 | $8.44 | $28.75 | $33.28 |
| Human Papilloma Virus (HPV) | 87621 | $150 | $13.33 | $27.88 | $33.28 |
| Chlamydia dubliniensis | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Chlamydia krusei | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Chlamydia tropicalis | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Atobiunm Vaginae | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Chlamydia trachomonis | 87491 | $150 | $13.33 | $27.88 | $24.67 |
| N. Gonorrhea | 87591 | $150 | $13.33 | $27.88 | $24.67 |
| Ureaplasma | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Mycoplasma genitalium | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Trichomonas | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Gardnerella vaginalis | 87511 | $150 | $13.33 | $27.88 | $24.67 |
| Mobiluncus mulierus | 87798 | $150 | $13.33 | $27.88 | $24.67 |

| | | | | | |
|---|---|---|---|---|---|
| Mobiluncus curtisiis | 87798 | $150 | $13.33 | $27.88 | $24.67 |
| Chamydia Glabrata | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Chalmydia parapsilosis | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Chlamydia albacans | 87481 | $50 | $4.44 | $27.88 | $24.67 |
| Herpes simplex 1 | 87529 | $150 | $13.33 | $27.88 | $24.67 |
| Herpes simplex 2 | 87529 | $150 | $13.33 | $27.88 | $24.67 |
| **Total** | | **$2,195** | **$195** | **$531** | **$486** |
| | | | | | |
| **Note**: All tests bundled into a single panel for physician clients | | | | | |
| | | | | | |
| Percentage of Patient cost | | **9%** | | | |
| Amount of Client Discount | | **91%** | | | |
| | | **Average Overcharge** | | **272%** | **249%** |
| (1) 2007 Fee Schedule | | | | | |
| (2) 2012 Fee Schedule | | | | | |
| (3) 2011 Fee Schedule | | | | | |
| (4) 2015 Fee Schedule | | | | | |

167.    The failure to pass along the lowest charge to Medicaid resulted in overcharges between 249% and 272%.

### E.    Defendants Violated the California Insurance Fraud Prevention Act

168.    Relator also brings claims under California's Insurance Fraud Preventions Act (IFPA), Cal. Ins. Code § 1871.7, which largely mirrors the FCA and CFCA. This provision has been construed as prohibiting charging private insurers for services procured via kickbacks.

169.    Waiving Patient Co-Pays and Deductibles, and providing physicians with free testing, also violates the California Insurance Fraud Prevention Act, Insurance Code 1871.7(a) and (b), subjecting Defendants to treble damages for the amount of the claim for compensation billed to private insurers in California.

170.    The effect of Defendants' scheme is to deceive health benefits plans into paying far more for services than the plans are obligated to pay. By misleading plan members that they are not responsible for any deductible or co-payments, BRLI/OPKO increases the volume of its business while simultaneously increasing the damage to the managed care companies and the plans they serve.

171.    As described above in paragraphs 58 - 127, BRLI's waiver and free testing schemes were rampant in California.

172.    OPKO / BRLI systematically promised its California physicians that they will never collect copayments or patient deductible payments from their patients.  For example, Women's Health sales representatives including Brandy Gentry, Savita Devlin, and Mariam Lieberman routinely carry out this directive at facilities such as Health Care for Women in Salinas, California and with Michael Contro, M.D., OBGYN.  The underlying fraud began at BRLI and has continued after BRLI was acquired by OPKO on August 20, 2015.

173.    Relator-member Prendergast also has direct knowledge that OPKO implemented its new sham three bill waiver scheme in California.  In late 2017, Jack Smith, Senior Director of Sales instructed Relator-member Prendergast to visit Tahema Women's Medical Group in Northern California and assure the office manager that their patients ignore the bills, that they will never be sent to collections, and that the bills will be written off.

174.    OPKO's waiving of co-pays and deductibles and providing free lab testing to physicians to refer business are fraudulent kickback schemes. OPKO's fraudulent kickback schemes violate California Insurance Code § 1871.7(a) because they cause OPKO's sales representatives to act as "runners, cappers, steerers, or other persons" to procure physicians (i.e., "clients"), who in turn perform tests "that will be the basis of a claim against an insured individual or his or her insurer." (Cal. Ins. Code § 1871.7). These violations subject OPKO to treble damages for the amount of the claim for compensation billed to the insurer.

40

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**On Behalf of the United States**
**Federal False Claims Act, Presenting False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

175.   Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

176.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

177.   Defendants knowingly presented false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare and Medicaid programs that were higher than it was permitted to claim or charge by applicable law.

178.   Among other things, Defendants knowingly submitted false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to Medicaid, half of which is paid for by the federal government.

179.   Defendants knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

180.   The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

41

**SECOND CAUSE OF ACTION**
**On Behalf of the United States Federal False Claims Act, Making or Using False Records**
**or Statements Material to Payment or Approval of False Claims**
**31 U.S.C. § 3729(a)(1)(B)**

181.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

182.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

183.    Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by the Medicare and Medicaid programs that were higher than they were permitted to claim or charge by applicable law.

184.    Among other things, Defendants knowingly submitted false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payments for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) and (5) failing to pass on lowest charges to Medicaid, half of which is paid for by the federal government.

185.    Defendants knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

186.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## THIRD CAUSE OF ACTION
### (In the Alternative)
### On Behalf of the United States, Retention of Proceeds to Which Not Entitled
### 31 U.S.C. § 3729(a)(1)(G)

187.     Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

188.     In the alternative, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

189.     Among other things, Defendants knowingly submitted and received payment for false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to Medicaid, half of which is paid for by the federal government.

190.     As discussed above, Defendant received far more money from the Medicare and Medicaid programs than it was entitled to.  Defendant knew that it received more money than it was entitled to and avoided its obligation to return the excess money to the Government.

191.     The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## FOURTH CAUSE OF ACTION
### On Behalf of the State of California, California Insurance Frauds Prevention Act, Employment of Runner, Cappers and Steerers or Other Persons to Procure Patients
### Cal. Ins. Code § 1871.7(a)
### Against All Defendants

192.     Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

193.    Pursuant to California Insurance Code §1871.7(a), it is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure patients for the purpose of submitting a claim to that patient's insurance carrier.

194.    Defendants unlawfully incentivized physicians by paying illegal remuneration in the form of kickbacks—including by (1) waiving patient copays and deductibles and (2) waiving physician invoices and not billing patients for services—for the purpose of procuring more physicians to order tests, which were ultimately submitted to Medicare and private insurance companies for reimbursements.  Defendants conspired together and did so in order to submit claims for payment to insurance carriers in violation of Cal. Ins. Code §1871.7(a).

195.    Because the claims submitted to medical insurers by Defendants were procured by runners, cappers, and steerers and other persons, these claims were false and fraudulent under the California Insurance Frauds Prevention Act.

196.    This conduct was a substantial factor causing damages detailed herein.

**FIFTH CAUSE OF ACTION**
**On Behalf of the State of California, California Insurance Frauds Prevention Act, Presenting or Causing to be Presented False or Fraudulent Claims for the Payment of An Injury Under a Contract of Insurance**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(1)**
**Against All Defendants**

197.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

198.    Defendants have all either knowingly presented or caused to be presented false and fraudulent claims for reimbursement of tests, or conspired to present or cause to be presented such false and fraudulent claims.

199.    Among other things, Defendants knowingly submitted false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and

using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to State Medicaid programs.

200.    These claims were fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

201.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

202.    This conduct was a substantial factor causing damages detailed herein.

<u>**SIXTH CAUSE OF ACTION**</u>
**On Behalf of the State of California, California Insurance Frauds Prevention Act,**
**Knowingly Preparing or Making Any Writing in Support of a False or Fraudulent Claim**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(5)**
**Against All Defendants**

203.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

204.    Defendants have all either knowingly prepared, made, or subscribed a writing with an intent to present or use it, or to allow it to be presented, in support of false and fraudulent claims for the reimbursement of tests performed on patients, or have aided, abetted, and solicited, or conspired to make, or subscribe such a writing.

205.    These writings include bills for payment presented to insurance carriers for payment, and invoices prepared in support of such bills for payment.  Such bills for payment constitute false or fraudulent claims because through those bills:

- Defendants knowingly sought and falsely represented that they were entitled to

reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

206.    Among other things, Defendants knowingly submitted false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to State Medicaid programs.

207.    Defendants knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

208.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

209.    This conduct was a substantial factor causing damages detailed herein.

**SEVENTH CAUSE OF ACTION**
**On Behalf of the State of California, California Insurance Frauds Prevention Act,**
**Knowingly Making or Causing to be Made Any False or Fraudulent Claim for Payment of**
**a Health Benefit**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(6)**
**Against All Defendants**

210.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

211.    Defendants have all either knowingly presented or caused to be presented false and fraudulent claims for reimbursement of tests performed on patients, or have aided, abetted, and solicited, or conspired to present or cause to be presented such false and fraudulent claims.

212.    Among other things, Defendants knowingly submitted false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to State Medicaid programs.

213.    The claims were false or fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

214.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

215.    This conduct was a substantial factor causing damages detailed herein.

/ / /

/ / /

/ / /

/ / /

/ / /

**EIGHTH CAUSE OF ACTION**
**On Behalf of the State of California, California Insurance Frauds Prevention Act,**
**Soliciting, Accepting, and Referring Business to or From an Individual or Entity That**
**Intends to Violate Section 550 of the Penal Code or Section 1871.4 of the Insurance Code**
**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 549**
**Against All Defendants**

216.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

217.    Defendants have solicited, accepted, or referred business to or from an entity or individual that intended to violate Section 550 of the Penal Code or Section 1871.4 of the Insurance Code.

218.    Among other things, Defendants knowingly provided illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to State Medicaid programs.

219.    The claims were false or fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

220.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

221.    This conduct was a substantial factor causing damages detailed herein.

**NINTH CAUSE OF ACTION**
**On Behalf of the State of Florida**
**Florida False Claims Act, Presenting False Claims Florida Statute § 68.082(2)(a)**
**Against All Defendants**

222.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

223.    Florida has enacted a prohibition on waiver of co-payments and deductibles. Florida Statute section 817.234(7) provides that it is insurance fraud for any service provider, other than a hospital, to engage in a general practice of billing amounts as its usual and customary charge, if the provider has agreed with the insured or intends to waive deductibles or copayments or does not intent to collect the total amount of the charge.

224.    At all times relevant hereto, Defendants, and each of them, knowingly (as defined in defined in Florida Statute section 68.082, subdivision (1)(c)) presented, or caused to be presented, claims for payment or approval in the form of invoices submitted to Medicaid for Florida Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to Florida's Medicaid program.

225.    These claims were fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

49

226.    Defendants' conduct violated Florida Statute section 68.082, subsection (2)(a), and was a substantial factor in causing the State to sustain damages in an amount according to proof pursuant to Florida Statute section 68.082, subsection (2).

### TENTH CAUSE OF ACTION
**On Behalf of the State of Florida**
**Florida False Claims Act, Making or Using False Records or Statements to Obtain**
**Payment or Approval of False Claims Florida Statute § 68.082(2)(b)**
**Against All Defendants**

227.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

228.    Florida has enacted a prohibition on waiver of co-payments and deductibles. Florida Statute section 817.234(7) provides that it is insurance fraud for any service provider, other than a hospital, to engage in a general practice of billing amounts as its usual and customary charge, if the provider has agreed with the insured or intends to waive deductibles or copayments or does not intent to collect the total amount of the charge.

229.    At all times relevant hereto, Defendants, and each of them, knowingly (as defined in Florida Statute section 68.082, subdivision (1)(c)) made or used, or caused to be made or used, false records or statements to obtain payment or approval of false claims.

230.    Defendants have all either knowingly prepared, made, or subscribed a writing with an intent to present or use it, or to allow it to be presented, in support of false and fraudulent claims for the reimbursement of tests performed on patients, or have aided, abetted, and solicited, or conspired to make, or subscribe such a writing.

231.    These writings include bills for payment presented to insurance carriers for payment, and invoices prepared in support of such bills for payment.  Such bills for payment constitute false or fraudulent claims because through those bills:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

50

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

232.    Among other things, Defendants billed the AHCA for Florida Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to Florida's Medicaid program.

233.    Defendants knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

234.    Defendants' conduct violated Florida Statute section 68.082, subsection (2)(b), and was a substantial factor in causing the State to sustain damages in an amount according to proof pursuant to Florida Statute section 68.082, subsection (2).

### ELEVENTH CAUSE OF ACTION
**On Behalf of the Commonwealth of Massachusetts**
**Massachusetts False Claims Act, Presenting False Claims**
**Massachusetts General Laws chapter 12, § 5B(1)**
**Against All Defendants**

235.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

236.    At all times relevant hereto, Defendants, and each of them, knowingly (as defined in Massachusetts General Laws chapter 12, section 5A) presented, or caused to be presented, claims for payment or approval in the form of invoices submitted to MassHealth that reflected prices higher than the maximum reimbursement rates allowed by law.  Specifically, Defendants, and each of them, submitted or caused to be submitted invoices for payment of MassHealth

covered clinical laboratory tests at amounts grossly in excess of the amounts contemplated by law, resulting in great financial loss to the Commonwealth.

237.    Among other things, Defendants knowingly submitted false claims for MassHealth business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to MassHealth.

238.    These claims were fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

239.    Defendants' conduct violated Massachusetts General Laws chapter 12, section 5B(1), and was a substantial factor in causing the Commonwealth to sustain damages in an amount according to proof pursuant to Massachusetts General Laws chapter 12, section 5B.

**TWELFTH CAUSE OF ACTION**
**Massachusetts False Claims Act, Making or Using False Records or Statements**
**To Obtain Payment or Approval of False Claims**
**Massachusetts General Laws chapter 12, § 5B(2)**
**Against All Defendants**

240.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

241.     At all times relevant hereto, Defendants, and each of them, knowingly (as defined in Massachusetts General Laws chapter 12, section 5A) made or used, or caused to be made or used, false records or statements to obtain payment or approval of false claims.

242.     Defendants have all either knowingly prepared, made, or subscribed a writing with an intent to present or use it, or to allow it to be presented, in support of false and fraudulent claims for the reimbursement of tests performed on patients, or have aided, abetted, and solicited, or conspired to make, or subscribe such a writing.

243.     These writings include bills for payment presented to insurance carriers for payment, and invoices prepared in support of such bills for payment.  Such bills for payment constitute false or fraudulent claims because through those bills:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.
- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.
- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

244.     Among other things, Defendants knowingly submitted false claims for MassHealth business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to MassHealth.

245.     Defendants knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based,

were accurate, and were supplied in full compliance with all applicable statutes and regulations.

246.    Defendants' conduct violated Massachusetts General Laws chapter 12, section 5B(2), and was a substantial factor in causing the Commonwealth to sustain damages in an amount according to proof pursuant to Massachusetts General Laws chapter 12, section 5B.

**THIRTEENTH CAUSE OF ACTION**
**On Behalf of the Commonwealth of Massachusetts**
**Massachusetts False Claims Act, Retention of Proceeds of Inadvertently Submitted False Claims Massachusetts General Laws chapter 12, § 5B(9)**
**Against All Defendants**

247.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

248.    Plaintiff is informed and believes, and on that basis alleges, that as to each claim for MassHealth reimbursement submitted for a test as to which the Defendant charged other clients less than it charged to DHCFP, each Defendant: (a) was a beneficiary of an inadvertent submission of a false claim to DHCFP; (b) subsequently discovered the falsity of the claim; (c) and failed to disclose the false claim to DHCFP within a reasonable time after discovery of the false claim.

249.    Among other things, Defendants knowingly submitted and received payment for false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to MassHealth.

250.    As discussed above, Defendant received far more money from the Medicare and Medicaid programs than it was entitled to.  Defendant knew that it received more money than it was entitled to, and avoided its obligation to return the excess money to the Government.

251.    Defendants' conduct violated Massachusetts General Laws chapter 12, section 5B(9) and was a substantial factor in causing the Commonwealth to sustain damages in an amount according to proof pursuant to Massachusetts General Laws chapter 12, section 5B.

**FOURTEENTH CAUSE OF ACTION**
**On Behalf of the State of Georgia**
**Georgia False Medicaid Claims Act, Presenting False Claims**
**OCGA § 49-4-168.1(a)(1)**
**Against All Defendants**

252.    Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

253.    At all times relevant hereto, Defendants, and each of them knowingly (as defined in OCGA § 49-4-168(2)) presented, or caused to be presented, claims for payment or approval in the form of invoices submitted to Medicaid that reflected prices higher than the maximum reimbursement rates allowed by law.

254.    Among other things, Defendants knowingly submitted and received payment for false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to Georgia's Medicaid program.

255.    These claims were fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved,

55

the payment of illegal kickbacks.

256.     Defendants' conduct violated OGCA § 49-4-168.1(a)(1), and was a substantial factor in causing the State to sustain damages in an amount according to proof pursuant to OGCA § 49-4-168.1(a)(1).

**FIFTEENTH CAUSE OF ACTION**
**On Behalf of the State of Georgia**
**Georgia False Medicaid Claims Act, Making or Using False Records or Statements**
**Against All Defendants**

257.     Relator realleges and incorporates by reference the allegations contained in paragraph 1 through paragraph 174 of the Complaint as if fully set forth herein.

258.     At all times relevant hereto, Defendants, and each of them, knowingly (as defined in OCGA § 49-4-168(2)) made or used, or caused to be made or used, false records or statements to obtain payment or approval of false claims.

259.     Defendants have all either knowingly prepared, made, or subscribed a writing with an intent to present or use it, or to allow it to be presented, in support of false and fraudulent claims for the reimbursement of tests performed on patients, or have aided, abetted, and solicited, or conspired to make, or subscribe such a writing.

260.     These writings include bills for payment presented to insurance carriers for payment, and invoices prepared in support of such bills for payment.  Such bills for payment constitute false or fraudulent claims because through those bills:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

261.    Among other things, Defendants knowingly submitted and received payment for false claims for Medicare and Medicaid business that was obtained by means of, and as a result of, illegal kickbacks, in the form of (1) waiving patient co-payments and/or deductibles and (2) waiving physician invoices and not billing patients for services. Defendants further unlawfully submitted and received payment for false claims by (3) using unauthorized diagnostic codes to trigger payments and using improper CPT up-coding to increase revenue; (4) marketing tests that are neither reasonable nor necessary to diagnose disease or treat patients; and (5) failing to pass on lowest charges to Georgia's Medicaid program.

262.    Defendants' conduct violated OCGA § 49-4-168.1(a)(2), and was a substantial factor in causing the State to sustain damages in an amount according to proof pursuant to OCGA § 49-4-168.1(a).).

## VIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, by and through the Relator, prays judgment in its favor and against Defendants as follows:

1. That judgment be entered in favor of plaintiffs UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF GEORGIA, COMMONWEALTH OF MASSACHUSETTS, and STATE OF FLORIDA *ex rel*. FBG, LLC, and against Defendants according to proof, damages in the amount of:

        i.     Triple the amount of damages sustained by the Government;

        ii.    Civil penalties as provided by statute for each false claim;

        iii.   Recovery of costs;

        iv.   Pre- and post-judgment interest;

        v.    Such other and further relief as the Court deems just and proper;

2.    Further, Relator, on its own behalf, requests that Relator receive such maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF GEORGIA,

COMMONWEALTH OF MASSACHUSETTS, and STATE OF FLORIDA, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action.  Relator requests that its percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

Respectfully Submitted,

April 13, 2023                              **COTCHETT, PITRE & McCARTHY, LLP**


By:  ___*/s/ Justin T. Berger*_____

JUSTIN T. BERGER (CA SBN 250346)
(*Pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, California 94010
Telephone:        (650) 697-6000
Facsimile:        (650) 692-3606
E-Mail:             jberger@cpmlegal.com

GRACE Y. PARK (CA SBN 239928)
(*Pro hac vice*)
CARLOS URZUA (CA SBN 303176) (*Pro hac vice to be sought*)
JEFFREY G. MUDD (CA SBN 326304 (*Pro hac vice to be sought*)
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd., Suite 3088
Santa Monica, California 90405
Telephone:        (310) 392-2008
Facsimile:        (310) 392-0111
E-Mail:             gpark@cpmlegal.com
                         curzua@cpmlegal.com
                         jmudd@cpmlegal.com

*Attorneys for Relator*

IX.    **DEMAND FOR JURY TRIAL**

Relator FBG, LLC hereby demands a jury trial on all issues so triable.


Respectfully Submitted,


April 13, 2023                          **COTCHETT, PITRE & McCARTHY, LLP**


By:    */s/ Justin T. Berger*

JUSTIN T. BERGER (CA SBN 250346)
(*Pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, California 94010
Telephone:      (650) 697-6000
Facsimile:      (650) 692-3606
E-Mail:          jberger@cpmlegal.com

GRACE Y. PARK (CA SBN 239928)
(*Pro hac vice*)
CARLOS URZUA (CA SBN 303176) (*Pro hac vice to be sought*)
JEFFREY G. MUDD (CA SBN 326304 (*Pro hac vice to be sought*)
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd., Suite 3088
Santa Monica, California 90405
Telephone:      (310) 392-2008
Facsimile:      (310) 392-0111
E-Mail:          gpark@cpmlegal.com
                 curzua@cpmlegal.com
                 jmudd@cpmlegal.com

*Attorneys for Relator*